**STATE of Missouri, Respondent,**

v.

**Myron ERICKSON, Appellant.**

**No. WD 42387.**

Missouri Court of Appeals,
Western District.

May 8, 1990.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 3, 1990.

Application to Transfer Denied
Sept. 11, 1990.

FENNER, Judge.

Appellant, Myron Erickson, appeals his conviction of two counts of deviate sexual assault in the first degree, § 566.070, RSMo 1986. Appellant was sentenced after trial by jury to two concurrent sentences of three years' imprisonment.

Taken in the light most favorable to the verdict, the evidence supports appellant's convictions. In September, 1988, C.D.,[1] the victim herein, was a boy fourteen years old and just beginning the eighth grade. Up to the eighth grade, C.D. had been in classes for students with learning disabilities. C.D. felt isolated, he wanted to be with the other kids his age and was attempting to mainstream into regular classes.

C.D. lived with his mother and little brother. They moved around a lot and C.D. had been in four different schools. C.D.'s father was in prison and hadn't lived with them for three years. C.D.'s mother visited another man in prison by the name of David. She took C.D. to visit David in prison three times a week. C.D.'s mother said that C.D. looked to David as his father.

Appellant lived in the same neighborhood as C.D. in 1988. They met in the summer of 1988 when C.D. began helping appellant with work around appellant's house, riding appellant's horses and operating appellant's riding lawn mower. After appellant had known C.D. for about two weeks, appellant told C.D.'s mother that he would like to reward C.D. for his work around appellant's house by having C.D. stay overnight at appellant's house. C.D.'s mother agreed and an overnight visit took place on September 10, 1988. The following weekend appellant again stated that he wanted C.D. to spend the night to reward him.

C.D. began school on September 6, and he was not doing well. Appellant spoke with C.D.'s mother and offered to tutor C.D. after school. Appellant was an attorney who taught business courses at the University of Missouri, Columbia, and

William D. Rotts, Columbia, for appellant.

William L. Webster, Atty. Gen., Elizabeth L. Ziegler, Asst. Atty. Gen., Jefferson City, for respondent.

Before NUGENT, C.J., FENNER, J., and WASSERSTROM, Senior Judge.

1. Not the victim's actual initials.

C.D.'s mother knew of appellant's position at the University.

Appellant began tutoring C.D. on September 12, 1988. Originally, the tutoring was on Tuesdays, Thursdays and Fridays. Appellant would pick C.D. up at his house at 4:30 p.m. and return him home before 9:00 p.m.

Sometime in the third week of September, 1988, appellant told C.D.'s mother that he would be able to tutor C.D. on Mondays and Wednesdays as well as the other days. C.D. began to stay later into the night at appellant's home. After about four weeks of tutoring, appellant suggested to C.D.'s mother that they pretend they were married, but separated. Appellant explained that he could then pretend he was C.D.'s father so they could do things a father and son would do. Appellant would also send letters home with C.D. in regard to overnight visits and the need for him to spend more time with C.D.

Shortly after his tutoring sessions with appellant had begun, C.D.'s behavior changed and his mother began having trouble with him. C.D. became rude to his mother and her friends as well as his brother. C.D. would appear angry when he came home from appellant's house.

On October 15 or 16, 1988, C.D.'s mother called appellant and told him that the hours C.D. was spending with him had gotten out of control to the extent that C.D. was no longer seeing his family. Appellant became angry and said that in order to do a proper job with C.D. he needed to spend more time with him.

On October 16, 1988, C.D.'s mother saw him sitting in his room with his pants unzipped, looking at his penis. When she asked him what he was doing, C.D. said that his zipper had caught his penis. C.D. showed her two scabs on his penis. When she questioned this explanation, C.D. eventually told her that appellant had been "playing" with him. C.D. said that appellant had told him to lie about the zipper.

On October 18, 1988, C.D. was examined by a physician. The examination revealed a one millimeter lesion on the underneath surface of C.D.'s penis and another spot at a different location on C.D.'s penis.

C.D. testified that after he had been tutoring with appellant for a while, that appellant began touching his penis. The first time appellant touched C.D.'s penis, appellant unzipped C.D.'s pants, reached under his underwear and touched C.D.'s penis until C.D. ejaculated. On another occasion, the subject of Count I, C.D. was sitting on appellant's bed when appellant removed C.D.'s pants, lay C.D. down and began "playing" with C.D. Appellant had his pants "half down" and "played with himself."

On a third occasion, the subject of Count II, appellant gave C.D. a drink mixed with tequila and Mountain Dew on a night when C.D. was to spend the night. C.D. was given sufficient alcohol to cause him to feel "drunk". The two stayed up until approximately 4:00 a.m., when appellant told C.D. to go to sleep on appellant's bed. Appellant then came to bed and moved his hand toward C.D.'s body. C.D. was feeling sick and got up to go outside and get some fresh air. C.D. then went to sleep on the couch. C.D. was lying on the couch on his stomach when appellant approached him, turned him onto his back and grabbed C.D.'s penis. Appellant rubbed his hand up and down C.D.'s penis, but when C.D. did not ejaculate appellant stopped and went to bed. When two scabs appeared on C.D.'s penis, appellant told him to say that his penis got caught in his zipper.

On October 24, 1988, the sheriff's department served a search warrant on appellant's home where they found a partially empty bottle of tequila and bottles of Mountain Dew. Appellant agreed to waive his *Miranda* rights and was questioned by the sheriff's department. Appellant said that C.D. was very naive about his bodily functions and learning about his own sexuality and that he had decided to help C.D. in those areas. Appellant said that he had helped C.D. with his homework and stated "[e]verything I did I did for [CD], his education." When asked whether that included C.D.'s sexual education, appellant stated, "Yes, I was very explicit." Appellant

stated that he believed C.D. had spent the night three times and that C.D. was undressed everytime because he would take showers. Appellant said that he didn't do anything with the intent of hurting C.D. Appellant said that in teaching C.D. about sex he had discussed masturbation with him, but that he never told C.D. to masturbate or masturbated himself in front of C.D. Appellant was told that C.D. said that appellant had masturbated him and then asked if appellant was saying that C.D. was lying. Appellant responded that he was specifically not saying that C.D. was lying.

C.D. testified that his mother was physically and mentally abusive toward him and that he did not want to live with her.

## I.

■ Appellant first argues that the trial court erred by not recognizing the necessity of disqualifying all three circuit judges in the Thirteenth Judicial Circuit. Appellant argues that since he was an attorney who practiced within said circuit there would be "unknown prejudice" harbored against him and that the judges might hold him to a higher standard of conduct because of his being an attorney.

Appellant's case was first assigned to Judge Ellen Roper. Appellant filed an Application For Change of Venue and Motion For Order Disqualifying Judge Roper as well as the other two circuit judges, Judge Conley and Judge Hamilton. Following appellant's Application, Judge Roper entered her disqualification and transferred appellant's case to Judge Conley, the Presiding Judge.

Rule 32.08 is the applicable rule for a joint application for change of venue and change of judge in a criminal proceeding. Rule 32.08 provides in pertinent part as follows:

(c) Upon presentation of a timely application for both a change of judge and a change of venue the judge shall promptly sustain the application for change of judge, and:

\*　\*　\*　\*　\*　\*

(4) If the case is being heard by a circuit judge in a circuit having three or more circuit judges, the judge shall transfer the case to the presiding judge for assignment by lot or the presiding judge may request this Court to transfer a judge or the case may be assigned in accordance with local rules. The assigned judge shall rule on the application for change of venue.

Judge Roper's disqualification of herself and transfer of the case to the Presiding Judge was in accordance with Rule 32.08. There is no provision in the Rules or Statutes for disqualification of all the judges in the Thirteenth Circuit as was requested by appellant. Judge Roper did not err by disqualifying herself and transferring appellant's case to the Presiding Judge. Judge Roper was obligated to disqualify herself without the need for appellant to allege any basis for her disqualification. Appellant's application before Judge Roper was a timely application under the Rules. Judge Roper was required under the terms of Rule 32.08(c) to enter her disqualification regardless of whether or not appellant alleged cause for the disqualification.

After appellant's case was transferred to Judge Conley, appellant filed a motion to disqualify Judge Conley. Appellant argued again that since he was an attorney who had practiced before Judge Conley that he was subject to "unknown prejudice" and that a higher standard of conduct might be imposed upon him. Appellant argues that Judge Conley should have disqualified himself and recognized the need to have a Judge from outside the Thirteenth Circuit hear his case.

Rule 32.09 is applicable to a second request for a change of judge in a criminal proceeding. Rule 32.09 provides in pertinent part as follows:

(a) Neither the state nor any defendant shall be allowed more than one change of judge in any criminal proceeding except that the exercise of an application for change of judge prior to the preliminary examination shall not prohibit a party from filing another application for

change of judge if the defendant is held to answer for the charge.

\* \* \* \* \* \*

(c) However, nothing contained in Rules 32.01 through 32.09, inclusive, shall prohibit a judge from ordering a change ... of judge when fundamental fairness so requires.

In accordance with the terms of Rule 32.09 the only consideration in regard to the application to disqualify Judge Conley was whether fundamental fairness required his disqualification. The determination of when fundamental fairness requires a judge to disqualify under Rule 32.09(c) is a discretionary matter best left to the trial judge. *State v. Owens,* 759 S.W.2d 73, 75 (Mo.App.1988).

Judge Conley did not abuse his discretion in denying appellant's request that he disqualify himself. There is no indication in the entire record that it was fundamentally unfair for Judge Conley to preside over appellant's trial.

Appellant's argument that all circuit judges in the Thirteenth Circuit should have been disqualified is denied.

## II.

■ Appellant next argues that Judge Conley erred by changing venue from Boone County to Callaway County, the other county in the Thirteenth Circuit, rather than ordering a change of venue to a county outside the circuit.

Evidence was heard on appellant's motion for change of venue. Appellant called ten witnesses in support of his motion for change of venue. All of the witnesses called were either friends or business acquaintances of appellant except for one witness who was a sergeant in the Boone County Sheriff's Department. The witnesses all expressed their opinion that appellant would not be able to receive a fair trial in Boone County as a result of the media attention that had been given to appellant's case. Appellant also presented evidence of various media reports on his case. At the conclusion of appellant's evidence, the court found that there had not

been much evidence that the media coverage required a change of venue, but out of an abundance of caution, venue would be changed to Callaway County.

After venue had been changed to Callaway County, appellant filed another application for change of venue arguing that the inhabitants of Callaway County were prejudiced against him. Appellant presented additional evidence in support of this motion showing the broadcast range of the area radio and television stations.

■ The decision whether to grant or deny a change of venue on the basis of pretrial publicity rests within the trial court's discretion, and its ruling will not be disturbed unless an abuse of discretion is demonstrated. *State v. Leisure,* 749 S.W.2d 366, 376 (Mo. banc 1988), *cert. denied,* —— U.S. ——, 110 S.Ct. 724, 107 L.Ed.2d 743 (1990). In order to sustain such a request for change of venue, appellant must establish that the inhabitants of the county are so prejudiced against him that a fair trial cannot be had therein. *Id.* The question relevant to the determination whether a criminal trial is impartial is not whether the community remembers the case, but rather whether the jurors at the trial had such fixed opinions that they could not judge impartially the guilt of the defendant. *State v. Gray,* 731 S.W.2d 275, 280–81 (Mo.App.1987); quoting *Patton v. Yount,* 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984).

The evidence presented in the case at bar did not establish prejudice. The fact that appellant's friends and business associates had followed the publicity surrounding appellant's case is natural and does not establish that the residents of either Boone or Callaway Counties as a whole would be prejudiced against appellant.

As stated by the trial judge, venue was changed to Callaway County out of an abundance of caution. After change to Callaway County the only new evidence presented on the venue question was to establish the broadcast range of the area radio and television stations. There was no evidence presented that the residents of Callaway County were prejudiced against

appellant or even that any resident harbored such a feeling.

Most significantly, the voir dire in this case establishes that the trial judge did not abuse his discretion by failing to grant appellant's request for a change of venue from Callaway County. It appears from the record that 29 persons were present for voir dire. Of those present, only 10 had heard of the case and most of them stated that they had no recollection of the case until they heard more facts during voir dire. All of the individuals questioned testified that they could not recall details of what they had heard and all testified that they could set aside whatever slight information they recalled and serve as fair and impartial jurors.

Appellant's allegation that the trial court erred by not changing venue to a county other than Callaway County is denied.

### III.

■ Appellant's third point is that the trial court erred in admitting evidence of appellant's past sexual misconduct with individuals other than the victim.

At trial two witnesses testified concerning their relationship with appellant during vulnerable times in their lives when they were offered support by appellant. Both witnesses testified to appellant's sexual misconduct with them of a homosexual nature. Appellant argues that the testimony of these witnesses was inadmissible evidence of other crimes and that it was admitted solely to prejudice appellant.

The first witness whose testimony is questioned by appellant was P.K. P.K. testified that he met appellant when he was fourteen years old and was placed in foster care in appellant's home in June, 1979. P.K. was only in appellant's home for about a month in 1979. P.K. next stayed at appellant's home in March, 1987, when he went there in an effort to hide from the police. P.K. was hiding from the police because there was a warrant out for him *for* passing bad checks in Boone County. P.K. was at appellant's house for one and

one-half weeks to two weeks. P.K. had gone to appellant's house because he had known appellant for several years and trusted him. P.K. testified that this was a "real bad time" in his life when he needed help.

P.K. testified that while he was hiding at appellant's house, one night appellant gave him a mixed drink and P.K. began to doze off on the couch. As P.K. began to doze off, he realized that appellant had removed his tennis shoes and appellant told him to "just go and lay down on the bed." When P.K. went in on appellant's bed, he could feel appellant taking off his pants and undressing him. Then appellant engaged in oral sex with P.K. A couple of days later appellant tried to engage in this conduct again, but P.K. refused. A couple of days after P.K. refused appellant's homosexual advances, appellant turned P.K. in to the police.

The second witness whose testimony is questioned by appellant was M. Erickson (M.)[2]. M.'s first contact with appellant was through appellant's legal representation concerning some juvenile charges against M. M. was fourteen or fifteen at this time. When the juvenile charges were pending against M., his father sent him from Columbia to Tucson to live with his mother. Things didn't work out between M. and his mother so she sent him back to Columbia. M.'s mother knew that his father wouldn't agree to take him back so she sent M. to Columbia and told him to call his father when he got there. M. was fifteen or sixteen when his mother returned him to Columbia.

M. called his father from the Columbia bus station, but his father told him that he couldn't stay with him. M.'s father told him that he had remarried, things were going pretty good for him and he didn't have room for M. M. then called appellant and explained his situation to appellant telling appellant that he didn't have a home and his father told him to go to a foster home or call the police. Appellant came and got M. and took M. home with him. M. believed that this was in 1975. M. testified

2. Not the actual first initial.

that he stayed with appellant for a couple of years initially and continued to live in appellant's home off and on through January, 1986.

M. had lived with appellant for about a year when appellant began making homosexual advances toward him. M. had a problem with alcohol and on one occasion after M. had been drinking he was sleeping and awoke to find appellant performing oral sex on him. M. testified that this type of behavior occurred throughout the entire period that he lived with appellant.

M. testified that he continued to live with appellant because it wasn't as bad as living with his real father who beat him, his sister and his mother and his only alternative was to leave. M. said appellant always reminded him of the things appellant did for him. M. testified that he needed to feel that there was a father or someone in his life that loved him. M. looked up to appellant because he was an educated person and was better to him than his real father. M. said that appellant had his last name changed to Erickson.

▉ Evidence of other crimes is competent to prove the crime charged when such evidence tends to establish motive, intent, absence of mistake or accident, a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other, or identity of the person charged with the commission of the crime. *State v. Fraction*, 782 S.W.2d 764, 768 (Mo.App. 1989). Evidence of other crimes should be admitted under one of these exceptions only when the prejudicial effect of the evidence is outweighed by its probative value. *State v. Mallett*, 732 S.W.2d 527, 534 (Mo. banc 1987), *cert. denied*, 484 U.S. 933, 108 S.Ct. 309, 98 L.Ed.2d 267 (1987). This balancing of prejudicial effect and probative value lies within the sound discretion of the trial court. *Id.*

Evidence of other crimes has been admitted to show a common scheme or plan in cases similar to the case at bar. In *State v. Koster*, 684 S.W.2d 488 (Mo.App.1984), the defendant was convicted of deviate sexual assault in the first degree and sexual assault in the first degree on a female inmate at a juvenile detention center. Three other girls were allowed to testify regarding sexual advances made to them by the defendant while they were inmates at the juvenile detention center. Defendant was a house parent at the center. The girls were all approximately the same age; they were all under defendant's control; defendant initiated the encounters while he was alone with them; the defendant offered the girls special privileges; and, the girls were threatened with reprisals. These similarities were held sufficient to establish a common scheme.

In *State v. Smith*, 694 S.W.2d 901 (Mo. App.1985), defendant was convicted of deviate sexual assault in the first degree of a fourteen year old boy for whom defendant was acting as a foster parent. A ten year old boy, F.L.A., testified to sexual misconduct while he was in defendant's care without objection. Another boy, M.C.S., testified, over objection, to defendant's sexual misconduct when he lived with defendant while a senior in high school. The court held that the evidence established a common scheme or plan by the defendant to molest young boys in his care and that it was not error to admit the testimony of M.C.S. The court found that the sexual contact with the boys was identical; the place of the assaults was the same; the time of the assaults was the same; defendant's actions during the assault were the same; and, the victims were similar in that they were boys living in the defendant's home.

In *State v. Muthofer*, 731 S.W.2d 504 (Mo.App.1987), the defendant was convicted of three counts of sodomy and fifteen counts of deviate sexual assault in the first degree. The defendant was a soccer coach who was convicted of sexual misconduct with boys on his soccer team. Boys other than those who were the victims of the crimes with which appellant was charged were allowed to testify in regard to appellant's sexual misconduct with them. The court held that the state's evidence showed a common scheme or plan of the defendant whereby for many years he would system-

atically and regularly approach the youths in his charge, earn their respect, trust and admiration and then, cryptically, test their vulnerability in the confines of his home. The court found that implicit and explicit throughout the evidence was defendant's use of his position as soccer coach with its powers to advance or retard the youth's soccer careers. There was some question in regard to remoteness of time of the similar acts and it was held that any such question went to the weight to be given the testimony and not its admissibility. *Id.* at 509.

In the case at bar the testimony of P.K. and M. was relevant to show a common plan or scheme by appellant to molest desperate and immature males who looked to him for support that was otherwise lacking in their lives. The evidence showed that in both the charged and uncharged conduct appellant placed himself in a position where he could establish a relationship of trust with young boys. The boys were all close to the same age when appellant first put himself in a position to become a significant person in their lives. All three were in need of a father figure and lacking in a family support structure.

All three witnesses testified about homosexual advances by appellant in appellant's home under similar circumstances. C.D. testified to appellant giving him liquor which caused him to feel drunk and then being awakened by appellant's sexual advances. P.K. testified to similar behavior of appellant with him. M. also testified to appellant taking advantage of him when he was under the influence of alcohol and had fallen asleep. All of appellant's sexual advances took place when the individuals were staying at appellant's house. C.D. was there on overnight visits. P.K. and M. were actually living with appellant.

C.D. had no father at home, his mother abused him and he was not happy living with her, he was struggling to fit in at school and having a difficult time with his grades. Appellant acted as C.D.'s friend, father figure and tutor to help him survive in school. Similarly, when P.K. was subjected to appellant's sexual advances, he had gone to appellant because he trusted appellant. P.K.'s life was unsettled and he was particularly vulnerable because he was hiding from the police and he had nowhere else to go.

M. was another young boy without support from his family. M. was particularly vulnerable to appellant because neither of his parents would allow him to live with them. M. was in need of love and attention and appellant provided it to him. M. was desperately in need of appellant's help as were C.D. and P.K.

Appellant engaged all three in homosexual acts when their lives made them vulnerable to his advances. Appellant initially took P.K. into his home as a foster parent, he actually changed M.'s last name to his own and he tried to pretend to be C.D.'s father. Appellant clearly and systematically abused the trust that he purposefully established in a similar fashion with C.D., P.K. and M. It is implicit and explicit throughout the testimony herein that appellant used his superior education and position in life to take advantage of individuals he knew to be susceptible to his advances because of their misfortunes.

The trial court did not abuse its discretion by allowing the testimony of P.K. and M. The testimony of P.K. and M. showed a common scheme or plan by appellant.

■ Appellant's final argument is that there was insufficient evidence at trial to support his conviction because the only evidence to support his conviction was the uncorroborated, inconsistent testimony of the victim.

■ Upon reviewing the sufficiency of the evidence, an appellate court will consider those facts and inferences in the light most favorable to the verdict and disregard all contrary evidence and inferences. *State v. Van Orman*, 642 S.W.2d 636, 637 (Mo. 1982). It has been held in sexual assault cases that in those cases where the evidence of the victim is of a contradictory nature or, when applied to the admitted facts in the case, the victim's testimony is not convincing and leaves the court clouded with doubt, that the victim's testimony must be corroborated or a conviction cannot be sustained. *State v. Ellis*, 710 S.W.2d 378, 380 (Mo.App.1986). The testimony must be so contradictory or in con-

flict with physical facts, surrounding circumstances, and common experience as to be unconvincing. *State v. Sipes*, 651 S.W.2d 659, 660 (Mo.App.1983). However, the principal does not apply where the inconsistency or contradiction bears upon proof not essential to the case. *State v. Ellis*, 710 S.W.2d at 380.

Appellant argues that C.D.'s testimony lacked credibility as follows: C.D. admitted to having viewed sexually explicit magazines and to having exposed himself to girls, yet he testified that he never had an ejaculation until appellant touched him; C.D.'s story that he was examining his penis when his mother came in his room is not believable; C.D. contradicted himself by first saying that he caught his penis in his zipper and then accusing appellant of having caused the scabs; and that it is difficult to believe that the sexual misconduct of appellant to which C.D. testified would have taken place while there were other people in the house.[3]

Most, if not all, of these matters are readily believable and clearly none of them are so unconvincing as to create doubt bearing upon proof essential to appellant's conviction that the conviction cannot stand.

Appellant also argues that C.D.'s testimony was inherently inconsistent as follows: C.D. at one point testified that he really didn't like going over to appellant's house and then testified that he liked going to appellant's house because there were so many things to do there; C.D. testified on direct examination that he would have rather stayed at home than go to appellant's house; on cross-examination C.D. testified about his abusive home environment; C.D. repeatedly referred to his "private parts", then conceded that he really called it his "d-i-c-k", and finally admitted that he really called this part of his anatomy his "dick"; in regard to the mixed drink, C.D. first said that he drank it unknowingly, and then said he asked appellant if he could try a mixed drink; at one point C.D. said he only had a couple of sips of the drink and then C.D. said he drank half of it. Appellant makes further arguments about C.D.'s tes-

timony in regard to how long appellant was touching C.D.'s penis on various occasions and the fact that C.D.'s statement about appellant advising him to tell his mother the story about catching his penis in his zipper first coming out in court as opposed to earlier statements by C.D.

Once again, most of these alleged inconsistencies are readily understandable. Given the facts as established herein, it is no wonder that C.D. had mixed feelings about his home environment and the bright and dark side of his visits to appellant's home. Nor does it come as any great surprise that C.D. was reluctant to refer to the part of his anatomy that he was required to identify in open court. Clearly, none of the matters that appellant attempts to identify as inherent inconsistencies were essential to the proof of the state's case.

Appellant's argument that there was insufficient evidence to support his conviction because the only evidence to support his conviction was the uncorroborated inconsistent testimony of C.D. is without merit.

The judgment of the trial court is affirmed.

All concur.

---

3. Appellant's daughter and a female friend of hers were living in appellant's house when the sexual contact between appellant and C.D. took place. C.D. testified that the girls would be upstairs in their own rooms when the conduct occurred.