STATE of Missouri, Respondent,

v.

Alexander BROOKS, Appellant.

No. 57347.

Missouri Court of Appeals,
Eastern District,
Division Four.

May 14, 1991.

Motion for Rehearing and/or Transfer to
Supreme Court Denied June 12, 1991.

Application to Transfer Denied
July 23, 1991.

Deborah B. Wafer, St. Louis, for appellant.

William L. Webster, Atty. Gen., Robert P. Sass, Asst. Atty. Gen., Jefferson City, for respondent.

SATZ, Judge.

Defendant was found guilty by a jury of four counts of forcible rape, § 566.030, RSMo 1986, and one count of felonious restraint, § 565.120, RSMo 1986. He was sentenced to four consecutive life sentences on the forcible rape counts and to seven years imprisonment on the felonious restraint count, the latter sentence to be served concurrently with the former sentences. Defendant appeals. We reverse and remand.

Defendant raises several issues on appeal. We address three of them: (1) the submissibility of the state's case; (2) the admissibility of evidence that defendant had previously raped another woman; and (3) the requirement of consecutive sentences for the rape convictions.

We hold: (1) the state did make a submissible case; (2) the admission of testimony about the prior incident of rape was prejudicial error; and (3) the trial court was not required by statute to impose consecutive sentences on the rape convictions.

### Submissibility

Defendant contends the state failed to make a submissible case on the fourth count of rape. He contends the description by the victim, R.W., of the fourth act of rape was not sufficient to show a fourth rape occurred.

■ To resolve the issue of submissibility, we view the evidence and inferences most favorably to the verdict and disregard all contrary evidence and inferences. *E.g., State v. Overkamp*, 646 S.W.2d 733, 736 (Mo.1983). We do not weigh the evidence; rather, we determine whether the evidence was sufficient for twelve reasonable people to have found the defendant guilty as charged. *E.g. State v. Porter*, 640 S.W.2d 125, 126 (Mo.1982).

So viewed, the record shows that R.W. hired a contractor to repair a leak in the roof of her home and also to repair plaster damaged by water from the leak. The contractor brought defendant with him. They determined what was needed to do the job and came back several days later. Defendant stayed to do the work. The contractor left.

Defendant returned several days later, apparently to smooth the plaster. R.W. asked defendant if he would change a light bulb that had burned out. Defendant determined the light bulb was not burned out. Apparently, the fixture was defective. Defendant said he could fix it for five dollars. R.W. gave him the five dollars, but he could not finish the repair that night.

Defendant returned a few nights later. He told R.W. he needed another thirty dollars to fix the light fixture. She replied that, if it cost that much, she would do without the light. She then started to walk defendant to the door. On the way to the door, defendant grabbed her and "forced [her] down to the floor and he raped [her] right there." She explained that, by rape, she meant he put his penis in her vagina.

While on the floor, defendant asked her if she had any gold chains. She said no. Defendant then insisted they get up and go to her bed.

On the bed, defendant raped her a second time. She again explained what she meant by rape: "[He did] the same as he did on the floor, I could feel his penis going inside of me." After that, the two of them laid on the bed for a while, with defendant's legs across her body and his arm over her back "[s]o [she] couldn't move without him knowing it."

He, then, raped her again, possibly between 4:00 and 5:00 in the morning. And, when asked to explain "what did [defendant] do when you say he raped you again," she replied: "He did the same thing again." "Did he put his penis in your vagina", the prosecutor asked, and she replied: "Yes, uh-huh."

Then, the following exchange took place between R.W. and the prosecutor:

Q: [Prosecutor]: And did he rape you a fourth time, Miss [R.W.]?

A: [R.W.]: No, no, not that I—not that I remember.

Q: Okay. Do you remember telling the police that he raped you on four different occasions?

A: Beg your pardon?

Q: Do you remember telling the police that he raped you on four different occasions?

A: Well, that included the one in the living room.

Q: I'm sorry?

A: Yeah.

Q: So he raped you three times in the bed?

A: Uh-huh.

Q: I'm sorry, I got confused.

A: That's all right.

Q: So four times in total, one on the floor and three in your bed?

A: Right.

■ Defendant argues R.W.'s testimony about the fourth rape is insufficient to establish a fourth rape occurred because "the state cannot prove the crime of rape merely by a statement that there has been a rape." We disagree.

R.W. was 78 years old at the time of this incident. She testified there were four rapes, one in her living room and three in her bed. Twice voluntarily and once in response to the prosecutor's questions, she testified that by "rape" she meant she could feel defendant's penis in her vagina. Admittedly, her only description of the fourth act was an answer to the prosecutor's questions: she was raped. She described the first three acts in graphic detail, however, and, from this, a reasonable inference would be that the fourth act, described by her as rape, was sexual intercourse by force.

■ Rape may be proved by the uncorroborated testimony of the victim, *State v. Bryant,* 756 S.W.2d 594, 597 (Mo.App. 1988), and, even the testimony of a fifteen year old victim that defendant "had sexual intercourse with [her] on several occasions", without more, was sufficient to sus-

tain a jury conviction of "sexual assault in the first degree." *State v. Elmore,* 723 S.W.2d 418, 420–421 (Mo.App.1986).

Defendant notes that, when the inquiry about the fourth rape began, R.W. initially stated there was no fourth rape. "The only indication whatsoever of a fourth rape," according to defendant, "was the prosecutor's suggestion to [R.W.] that [she] told the police there were four rapes.... The prosecutor never elicited proof of the fourth rape but rather concluded that there were four rapes."

As noted, we read R.W.'s testimony differently. Apparently, R.W. became confused about the prosecutor's questions, and, when the prosecutor asked if there was a fourth rape, R.W. evidently thought the prosecutor meant a fourth rape on the bed. Thus, when asked about her statement to the police, she explained that the four rapes she described "included the one in the living room." The prosecutor did not merely conclude there were four rapes; rather, the prosecutor asked R.W. if there were four rapes, and she answered "right." To us, this is an unequivocal statement that defendant raped her four times, and, with her graphic descriptions of the three prior rapes, it is reasonable to infer when she said "rape" she knew what that term meant.

Lest there be any question about the other elements of forcible rape, R.W. also testified she did not consent to have sexual intercourse with defendant and she was not married. R.W.'s testimony established all the elements of forcible rape; therefore, the state made a submissible case.

### Evidence of Prior Rape

At trial, the state called A.R. as a witness. She testified that defendant raped her in Chicago three years prior to the present rapes. At that time, she was 59 years old. Defendant lived about three houses from her, and she knew him. One evening in November, 1985, she arrived home and found defendant standing in her driveway. Defendant told her he had bought some paint to paint some of her rooms, and she told him to set the paint

inside her living room on the first floor. Defendant asked her whether she wanted to see the paint, and, after she declined, defendant pushed her through her open door, followed her inside and raped her several times.

On appeal, the state contends this evidence of the prior uncharged rape is admissible to show either defendant's "common scheme or plan" or his "handiwork" of "raping mature women while in their residences ostensibly to perform repairs." We disagree.

Evidence of commission by a defendant of a crime separate and distinct from the crime charged may be irrelevant and, in turn, prejudicial, because that evidence may result in a conviction based on a crime with which the defendant is not charged. *See, e.g. State v. Trimble,* 638 S.W.2d 726, 732 (Mo. banc 1982), *cert. denied,* 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1031 (1983). The prejudice is worked in several ways. The most obvious is the jury may use the evidence of the prior crime to infer the defendant has a criminal disposition, generally, or a propensity or proclivity to commit the crime charged, which, in turn, results in the jury basing its finding of guilt on the prior crime. Thus, generally, evidence of prior uncharged crimes is inadmissible. *Id.*

Exceptions have been made to this general rule, however. Evidence of the uncharged crime which has independent logical relevance to a fact in issue may be admissible, *see, e.g. State v. Reese,* 364 Mo. 1221, 274 S.W.2d 304, 307 (1954), if its prejudicial effect does not outweigh its probative value. *Id.; State v. Mallett,* 732 S.W.2d 527, 534 (Mo. banc 1987) *cert. denied,* 484 U.S. 933, 108 S.Ct. 309, 98 L.Ed.2d 267 (1987). Thus, evidence of an uncharged crime is admissible if it tends to establish motive, intent, identity, the absence of mistake or accident, or a common

scheme or plan embracing the commission of two or more crimes so related that the proof of one tends to establish the other. *Mallett,* 732 S.W.2d at 534; *Reese,* 274 S.W.2d at 305. This list of theories for establishing independent logical relevance is not exhaustive.[1] More important here, the theories are not mutually exclusive. The uncharged crime may be admissible on one or more than one theory. But, "the test for relevance varies with the proponent's theory, and some theories have much more stringent requirements than others." Imwinkelried, *Uncharged Misconduct Evidence,* § 3:01 at 3 (1984). Contrary to the state's argument, defendant's commission of prior rapes fits neither the relevancy test for identity nor the test for common scheme or plan.

### *Identity*

The state argues the evidence of defendant's commission of prior rapes shows those rapes were committed in a manner similar to the commission of the present rapes. This similarity, the state argues, raises the inference that the rapes in the prior incident and here were the "handiwork" of defendant. This rationale has also been labelled as the defendant's "fingerprint", "signature" or "modus operandi."

Some jurisdictions permit the state to show the defendant's propensity to commit the sexual crime charged merely by showing the defendant's commission of the same sexual crime on parties other than the victim. Imwinkelried, §§ 4:11–4:16. In Missouri, we repeatedly state we do not do so. *See, e.g., State v. Young,* 661 S.W.2d 637, 639 (Mo.App.1983). However, when the sexual crime charged has a minor child for a victim, we do, at times, admit evidence of defendant's commission of the same crime on other children which may be used by the

---

1. Equally well recognized, in our state, is the parallel exception which permits proof of another crime, if the other crime is so linked together in point of time and circumstances with a crime charged that one cannot fully be shown without proving the other. *E.g. State v. Shumate,* 478 S.W.2d 328, 330–331 (Mo.1972); *State v. Taylor,* 8 S.W.2d 29, 35 (1928); *State v. King,* 588

S.W.2d 147, 150 (Mo.App.1979). Under this later exception, the state is permitted to paint a complete and coherent picture of the crime charged and is not required to sift and separate the evidence and exclude the testimony tending to prove the crime for which defendant is not on trial. *State v. Sinovich,* 46 S.W.2d 877, 880 (Mo.1931); *State v. King* at 150.

jury to find the defendant had the propensity to commit the crime charged, but we admit this evidence in the guise of a recognized exception to the prohibition against evidence of other crimes. *See, e.g. State v. Smith,* 694 S.W.2d 901 (Mo.App.1985).

However, we do, quite properly, permit the state to show the defendant's identity as the culprit who committed any sexual crime charged by evidence showing the defendant committed other sexual crimes which are sufficiently similar to the crime charged in time, place and method. *See, e.g. State v. Young, supra.* In *Young,* with reference to sexual crimes, this Court stated:

> In Missouri, the prosecution may show a defendant's propensity for illicit sexual relations with the prosecuting witness but similar sexual crimes with other persons are generally inadmissible for [the] purpose of showing propensity. *State v. Atkinson,* 293 S.W.2d 941, 944 (Mo.1956). See also, McCormick on Evidence, § 190, pp. 449–50 (2d ed.1972). Evidence, inadmissible for one purpose, may however, be admitted if introduced for a proper purpose. One such purpose is to prove identity....
>
> (T)o *prove other like crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused. Here much more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts. The device used must be so unusual and distinctive as to be like a signature.*
>
> *Id.* 661 S.W.2d at 639. (emphasis added)

This test for relevancy and, thus, admissibility is repeatedly used by our courts, without change in its language. *See, e.g. State v. McDaniels,* 668 S.W.2d 230, 232 (Mo.App.1984). Nonetheless, the key words of the test bear emphasizing.

■ There must be more than mere similarity between the crime charged and the uncharged crime. The charged and uncharged crime must be "nearly identical" or their methodology "so unusual and dis-

tinctive" that it is like a "signature". And, since acceptable logic does not vary from state to state, most other states impose equally stringent requirements before a permissible inference may be made that the perpetrator of both the uncharged and charged crime is the same person. Thus, the method used to commit the crimes must be " 'distinguishing,' 'distinctive,' 'dramatic[ally] similar,' ... 'idiosyncratic,' 'parallel,' 'peculiar,' 'remarkably similar,' 'signature quality' [or] 'strikingly similar.' " Imwinkelried, *supra,* § 3:12 at 26. In the final analysis, however, the question simply comes down to whether the crimes are similar enough to support an inference that the same person committed both.

■ The state argues there are sufficient similarities between the two incidents of rape here to show defendant was the culprit in both. According to the state,

> [i]n both cases the victims were mature women[.] [Defendant] did work for them in their houses. He repeatedly raped them and held them for hours. He raped them in their homes in the early evening hours. He asked them for money. He knocked them down and had forcible sex with them.... He had a discussion with them about calling the police or not calling the police.

We have some question whether the facts as the state presents them would be sufficient to support a rational inference that the same person committed both crimes. When we look at some of the differences between the two incidents, however, we are convinced the first incident of rape has minimal probative value, if any, on the issue of defendant's identity.

A.R. was raped in Chicago. The victim here was raped in St. Louis. The uncharged incident took place three years before the rapes in question. A.R. was brutally raped, choked and threatened with death when she was raped but R.W. was not choked nor threatened with death. Thus, while we do not mean to minimize the violence inherent in rape, the force used in the present incident was markedly different from the force used in the prior

incident. Here there was no physical violence beyond restraint of the victim and the rape itself.

In addition, even cumulatively, the similarities between the two crimes do not support the inference that the the same person committed the two crimes. Gaining access to the victim's house ostensibly to perform maintenance is hardly the work of a master criminal using a unique method. Moreover, the state's description of both victims as "mature" masks the 20 years difference in their ages. In addition, the "discussion[s] ... about calling the police or not calling the police" are more distinguishing than similar. During the rape of A.R., defendant said he would have to kill A.R. so that she would not call the police. But during the rape of R.W., defendant said "I know as soon as I leave you're going to call the police." The fact that two rapists discuss with their victims the general topic of calling the police has very little probative force to show they were the same rapist when the discussions differed so greatly.

Given "the dangerous tendency and misleading probative force of this class of evidence[,] ... the inevitable tendency of such evidence to raise a legally spurious presumption of guilt in the minds of the jurors", *State v. Reese*, 274 S.W.2d at 307, the trial court erred in admitting the evidence of the rape of A.R. as proof of defendant's identity as the rapist of R.W.

### Common Plan or Scheme

Missouri Courts have long recognized the admissibility of evidence of other crimes by a defendant to prove the crime for which the defendant is now on trial was part of a larger plan. *See e.g. State v. Bailey*, 190 Mo. 257, 88 S.W. 733, 740–741 (1905). "Proof that the defendant entertained a plan, including the commission of the crime charged, is logically relevant to show the defendant's identity as the criminal." *Imwinkelried*, § 3:20 at 50. The justification for admitting evidence of other crimes to prove a plan is

that this involves no inference as to the defendant's character; instead his con-

duct is said to be caused by his conscious commitment to a course of conduct of which the charged crime is only a part. The other crime is admitted to show this larger goal rather than to show defendant's propensity to commit crimes.
Wright and Graham, *Federal Practice and Procedure: Evidence*, § 5244 at 500 (1978). *See, e.g., State v. Buxton*, [324 Mo. 78,] 22 S.W.2d 635 (Mo.1929).

Proof of the plan may show the prior uncharged crime was the predicate upon which the charged crime was based—a gun is stolen to be used later in a subsequent robbery and homicide. *State v. O'Neal*, 618 S.W.2d 31 (Mo.1981). Usually, the period of time between the sequential acts of misconduct is significant. *See, e.g. State v. Courter*, 793 S.W.2d 386, 390 (Mo.App. 1990); *See also, State v. Cutler*, 499 S.W.2d 387, 388 (Mo.1973). Proof of a plan may also show the charged and uncharged crimes are part of a plan directed against a common class of persons—the defendant kills all other possible heirs to an estate. *Imwinkelried*, § 3:22 at 56–57.

At one time, our courts strictly enforced the requirement that the existence of an actual plan be shown. Thus, in *Buxton*, 22 S.W.2d at 636, the Court stated:

It certainly is not enough to show that the person on trial committed one or more other crimes of the same general nature in the vicinity of the place where he is charged with committing the crime for which he is on trial, and that he committed such other crime or crimes at approximately the same time.

The *Buxton* Court discussed a number of other cases admitting evidence of other crimes but distinguished them. Most notably, it distinguished *State v. Carroll*, 232 S.W. 699 (Mo.1921), by noting that in *Carroll* the crimes "had some relation to the general criminal enterprise", 22 S.W.2d at 637, but in *Buxton* the evidence showed "each of the robberies was the result of an impulse born of the moment.... There is nothing in the record to prove the existence of a preconceived and deliberate criminal foray on the part of appellant ..., unless the mere fact of the commission of several

robberies establishes such general plan." *Id.* For a time, *Buxton* was not an anomaly. *See, e.g. State v. Spinks,* 344 Mo. 105, 125 S.W.2d 60 (1939) and cases collected therein.

This evidentiary requirement by *Buxton* makes sense. It precludes the possible conversion of the "common scheme or plan" exception into a rule admitting evidence of other crimes with only some similarity to prove the defendant's *propensity* to commit the crime charged. It also precludes the masking of an attempt to prove identity simply by labelling as a "common scheme or plan" crimes which do not meet the more stringent relevancy test of the identity exception.

However, in some jurisdictions, courts do admit into evidence a showing of similar crimes under the rubric "common plan or scheme." Imwinkelried, § 3:23 at 61. This use of the common plan exception has been dubbed the "spurious" plan exception. *Id.* The evidence is admitted under the rationale that the defendant had a plan to commit a series of similar crimes, *Id.*, or that the defendant was following a blueprint in committing the crimes. Wright and Graham, *supra,* § 5244, p. 493 (1991 Supp.). "Similarity or likeness between crimes is a sufficinet showing." Imwinkelried, § 3:23 at 61. The "common scheme or plan" exception is, in effect, converted "into a plan-to-commit-a-series-of-similar-crimes theory." *Id.*

In Missouri, our courts have, in effect, adopted this so-called "spurious plan" theory of submissibility and, thus, have admitted other crimes of limited as well as striking similarity as sufficient evidence of the existence of a scheme or plan. *See, e.g. State v. Clay,* 686 S.W.2d 516 (Mo.App. 1985) and cases collected therein. Quite often, this results in the common scheme or plan exception being conflated or mixed with the identity exception; the definitional lines separating these two exceptions become blurred; and the trial court admits evidence of other crimes without a clear rationale for doing so. This is especially prevalent in prosecution of an adult's sexual misconduct against minors. *See, e.g., State v. Courter,* 793 S.W.2d at 389–390.

In *Courter,* the defendant was convicted of fondling and stimulating the penis of a five or six year old boy, while the boy, referred to as the defendant's grandson, was staying with defendant on over-night visits. Under the common scheme or plan exception, the trial court admitted evidence that defendant, some twenty four years previously, "had forced sex on [another grandson] and other children by placing his mouth on their genitals and by forcing them to fondle [the defendant's] penis." *Id.* at 387. The appellate court found this evidence prejudicially inadmissible because it could "perceive no factual basis upon which the state may validly contend the challenged evidence . . . was admissible under the common scheme or plan exception." *Id.* at 390.[2]

The cases relied on by the state suffer from a less fatal but similar defect and are also clearly distinguishable from the present case. *State v. Erickson,* 793 S.W.2d 377 (Mo.App.1990); *State v. Dee,* 752 S.W.2d 942 (Mo.App.1988); *State v. Muthofer,* 731 S.W.2d 504 (Mo.App.1987); *State v. Smith, supra,* 694 S.W.2d 901; *State v. Dalton,* 587 S.W.2d 644 (Mo.App. 1979).

In *Smith,* the victim, a fourteen year old boy, was entrusted to the care of Smith, a single adult male, licensed as a foster parent. Smith was convicted of "deviate sexual assault" for "fondl[ing] [the boy's] testicles." 694 S.W.2d at 902. The trial court admitted evidence of Smith's sexual misconduct with other boys entrusted to his care. In affirming this admission of evidence, the appellate court said the evidence showed Smith's *"modus operandi"* in the sexual misconduct and "established a common scheme or plan" by Smith to sexually molest young boys entrusted to his care. *Id.*

■ There is no evidence mentioned or discussed in the opinion, however, which

---

**2.** The court also added that proof of events which occurred twenty-three or twenty-four years prior to the offense are time barred "as being too remote." *Id.* at 390.

tended to show the defendant had some overarching plan and the separate acts of sexual misconduct were a part of that plan. The key fact common to all the acts of sexual misconduct was Smith's special relationship to the victims—his adult authority vis-a-vis each boy. To use this key fact, common to all the incidents of sexual misconduct, along with other similarities as the basis for inferring a common scheme or plan may not be pristine logic. It is not, however, an unacceptable abuse of common sense. To us, the evidence of other sexual misconduct was sufficiently similar to the incident in question to establish an unusual *modus operandi*, and, thus, if this evidence were admissible, it would be, more appropriately, admissible under the identity exception.[3]

The facts held to establish a common scheme or plan in the other cases cited by the state are parallel, if not, completely similar. In *Erickson, Muthofer* and *Dalton*, each defendant was convicted of sexual misconduct against young boys, and, in each case, the court used the common scheme or plan exception to find as admissible evidence of the defendant's commission of similar sexual offenses against other young boys. The fact common to each case was the defendant's adult authority vis-a-vis the victims in question and the other boys. Erickson was a "father figure" to "desperate" and "immature" boys who resided with him, *Erickson,* 793 S.W.2d at 384; Muthofer was a soccer coach "with . . . power to advance or retard the youth's soccer careers", *Muthofer,* 731 S.W.2d at 508; and Dalton was a baby-sitter who exercised "control or custody over his wards." *Dalton,* 587 S.W.2d at 645. Thus, in each of these cases, the court used the fact of adult authority as the key to its finding the defendant's sexual offenses were part of a scheme.

Realistically, these cases simply exemplify the courts carving out an unexpressed special exception in child molestation cases to the prohibition against use of the defendant's disposition as circumstantial proof of his conduct. In any event, the actors in the present drama were all adults, which clearly distinguishes the present case from the key fact in these cases cited by the state.

Admittedly, in *Dee*, also cited by the state, the defendant was convicted of rape and sodomy of an adult victim. But, again in finding that evidence of the defendant's prior sexual misconduct was evidence of the defendant's scheme or plan, the court, in *Dee*, based its finding on the defendant's position as a social service case worker who used his position, supervising the care of children by their parents, to exercise control over the adult victim in question and the state's adult witnesses. *Dee,* 752 S.W.2d at 947. Clearly, this is not the case here.

In the present case, the state has not marshalled any evidence, and we are unable to find any, showing the two incidents of rapes here were part of a larger plan. Nor does the evidence show the prior incident, occurring three years previously, is admissible under the "spurious plan" rationale. As our analysis of the evidence under the "identity" exception shows, the differences between the two incidents here were much more significant than the similarities.

■ In short, we find the trial court abused its discretion in admitting evidence of the prior incident of rape. This prejudiced defendant by permitting the jury to find defendant guilty on inadmissible evidence. If evidence of a prior crime is not admissible under any exceptions to the general rule prohibiting its admission, the admission is presumed to be prejudicial. *See, e.g. Buxton,* 22 S.W.2d at 638; *Courter,* 793 S.W.2d at 388.

**3.** This is not to say the "identity" exception and the "common scheme or plan" exception are mutually exclusive. On appropriate facts an uncharged crime may be admissible under both exceptions. For example, an heir to an estate kills all other heirs by shooting each of them with an arrow dipped in copperhead venom. If the heir is charged with the murder of any one of the other heirs, the other murders are admissible to show the heir's "common scheme or plan" to become the sole heir or to show his "identity" by the unusual method used to kill each of the other heirs.

In addition, since proof of the felonious restraint charge was inextricably intertwined with the proof of the rape charges, we presume prejudice was also worked against defendant on the former charge.

### Consecutive Sentences

■ Defendant's final argument may arise again on retrial. He argues that the trial court erred in imposing consecutive sentences on the rape charges based on its stated belief that § 558.026.1 RSMo 1986 required consecutive sentences on rapes committed in the same incident.

In *Williams v. State*, 800 S.W.2d 739, 740 (Mo.banc 1990), our Supreme Court held that this statute granted the trial court discretion to impose sentences to be served concurrently or consecutively, rather than requiring consecutive sentences.

Judgment reversed and cause remanded.

SMITH, P.J., and CARL R. GAERTNER, J., concur.