STATE of Missouri, Respondent,

v.

Larry E. BERNARD, Appellant.

No. 74775.

Supreme Court of Missouri,
En Banc.

Feb. 23, 1993.

Kenneth C. Hensley, Raymore, for appellant.

William L. Webster, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

COVINGTON, Judge.

The appellant, Larry Bernard, was tried and convicted by a jury of sexual abuse in the first degree and attempted forcible sodomy. §§ 566.100 and .060, RSMo 1986. The trial court sentenced appellant to two years on the first degree sexual abuse conviction and five years for the attempted forcible sodomy conviction, the sentences to be served consecutively. The Missouri Court of Appeals, Western District, affirmed. This Court granted transfer. The judgment is reversed and the cause remanded for a new trial.

The evidence shows that in 1988 the victim, a fourteen year old male, attended a church in which appellant was the interim pastor. Appellant and the victim's family developed a close relationship, participating in many activities together. In October of 1988, appellant convinced the victim's family to give a surprise birthday party for the victim. As part of the birthday events, the appellant and the victim's family agreed that the victim should spend the night before the party with appellant. The victim's parents assumed that the victim would stay at appellant's house.

On the night of October 21, 1988, appellant took the victim, the victim's sister, and appellant's daughter to a movie. After the movie, appellant drove the two young women to their college dormitory. The victim was led to believe that the two women were going to be only briefly in the dormitory and would then return to the car. By prearrangement with the young women, appellant drove off without explanation to the victim. Appellant, with the victim in the car, drove for some time. The victim testified that during this time he was a "little bit scared" because he did not understand why appellant had left the women at the dormitory and because the victim did not know where appellant was taking him.

Eventually appellant stopped at a motel where he rented a room for himself and the victim. Appellant feigned waiting for someone to arrive while he and the victim watched television and played cards. After a time, appellant convinced the victim to play a game of "strip rummy." The game ended when both appellant and the victim had stripped to their underwear, at which time they got into a single bed and fell asleep.

During the night, the victim awakened to find appellant rubbing the victim's back, arm and chest. Appellant then moved his hand to the victim's genitals. The victim attempted to push appellant's hand away but was not strong enough. The victim told appellant to stop, but appellant continued to place his hands on the victim's genitals. The victim testified that he was terrified and tried repeatedly to stop appellant's activity. Later during the night, appellant placed his erect penis against the victim's genitals. The victim attempted to push away appellant, but appellant overpowered him.

The next morning, appellant began to caress the victim's arms and legs as he had done the night before. Afterward, appellant requested that the victim allow him to take a picture of the victim nude. The victim refused but did agree to being photographed in his underwear. Appellant then had the victim take a nude photograph of appellant. Upon leaving the motel, appellant encouraged the victim to take off his clothes and run around the car or to walk around the car in his underwear. The victim refused. Appellant then took the victim to the birthday party. The victim did not report the incident until more than one year later.

I.

Appellant contends that the trial court erred in allowing, over appellant's objection, four witnesses to testify regarding prior sexual abuse committed by appellant for which appellant was never charged.

The witnesses were members of appellant's youth group during 1977–78 in a church in which appellant was then pastor.

■ The general rule concerning the admission of evidence of uncharged crimes, wrongs, or acts is that evidence of prior uncharged misconduct is inadmissible for the purpose of showing the propensity of the defendant to commit such crimes. *State v. Reese,* 364 Mo. 1221, 274 S.W.2d 304, 307 (1954). There are exceptions to the rule. Evidence of prior misconduct of the defendant, although not admissible to show propensity, is admissible if the evidence is logically relevant, in that it has some legitimate tendency to establish directly the accused's guilt of the charges for which he is on trial, *State v. Sladek,* 835 S.W.2d 308, 311 (Mo. banc 1992) (quoting *State v. Reese,* 274 S.W.2d at 307), and if the evidence is legally relevant, in that its probative value outweighs its prejudicial effect. *State v. Mallett,* 732 S.W.2d 527, 534 (Mo. banc), *cert. denied,* 484 U.S. 933, 108 S.Ct. 309, 98 L.Ed.2d 267 (1987). The balancing of the effect and value of evidence rests within the sound discretion of the trial court. *See State v. Shaw,* 636 S.W.2d 667, 672 (Mo. banc), *cert. denied,* 459 U.S. 928, 103 S.Ct. 239, 74 L.Ed.2d 188 (1982).

■ Generally, evidence of other, uncharged misconduct has a legitimate tendency to prove the specific crime charged when it " 'tends to establish: (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other; [or] (5) the identity of the person charged with the commission of the crime on trial.' " *State v. Sladek,* 835 S.W.2d at 311 (quoting *People v. Molineux,* 168 N.Y. 264, 61 N.E. 286, 294 (1901)). The five enumerated exceptions have sometimes been difficult to define and apply. *State v. Sladek,* 835 S.W.2d at 314 (Thomas, J. concurring). Evidence of prior misconduct that does not fall within one of the five enumerated exceptions may nevertheless be admissible if the evidence is logically and legally relevant. *Id.* at 311–12.

In cases involving sexual abuse of children, the recent trend in Missouri has been liberally to allow the admission of evidence of prior sexual misconduct by the defendant. *State v. Lachterman,* 812 S.W.2d 759, 768 (Mo.App.1991). Cases that have admitted evidence of prior sexual misconduct have allowed it under three of the five enumerated exceptions: motive; identity; or common scheme or plan.[1] Neither motive nor identity is at issue in this case.

It is in the application of the common scheme or plan exception that courts most often have admitted evidence of the defendant's prior sexual abuse of minors other than the victim. Liberal use of the exception has led to a distortion of the original purpose of the exception. A recapitulation of the cases regarding the common scheme or plan exception is useful not only in understanding the development of the distortion but also in resolving the confusion born of it.

Courts have long recognized the admissibility of evidence of other crimes to prove that the crime for which the defendant is currently on trial was part of a larger plan. *See e.g. State v. Bailey,* 190 Mo. 257, 88 S.W. 733, 740–41 (1905). The common scheme or plan exception initially required proof of existence of an actual plan connecting the prior misconduct with the crime

---

1. Not all early appellate decisions that allowed into evidence testimony of prior sexual misconduct by the defendant relied upon one of the five specific exceptions mentioned in *Sladek.* Early cases consistently recognized that evidence of prior sexual misconduct between the defendant and the victim was admissible despite the general rule prohibiting evidence of prior misconduct of the defendant. *See State v. Bascue,* 485 S.W.2d 35, 37 (Mo.1972); *State v. Garner,* 481 S.W.2d 239, 241 (Mo.1972); *State v. Cason,* 252 S.W. 688, 689–90 (Mo.1923); *State v. Hersh,* 296 S.W. 433, 436 (Mo.1927); *State v. Baker,* 318 Mo. 542, 300 S.W. 699, 701–02 (Mo. 1927). These cases justified allowing evidence to be admitted at trial because the evidence tended to "show the relationship between the parties, and ... the probability that the parties committed the specific act charged. They constitute the foundation of an antecedent probability or of a corroboration." *Hersh,* 296 S.W. at 436.

charged. In *State v. Buxton*, 324 Mo. 78, 22 S.W.2d 635 (1929), this Court held "[i]t certainly is not enough to show that the person on trial committed one or more crimes of the same general nature" in order to fall within the common scheme or plan exception. *Buxton*, 22 S.W.2d at 637. For the prior crimes to be admissible under a common scheme or plan, it must be shown that the prior crimes had "some relation to the general criminal enterprise." *Id.*

In *State v. Atkinson*, 293 S.W.2d 941 (Mo.1956), this Court specifically rejected application of the common scheme or plan exception in a case involving evidence of prior sexual misconduct by the defendant with someone other than the victim. *Atkinson* involved an employer who sodomized his teenaged employee. The state argued that the evidence of defendant's prior sexual misconduct with two other teenage boys also employed by the defendant should be admissible because it indicated that the "defendant followed substantially the same pattern in his dealings with each of these three boys." The state contended "so strange and unusual are the acts of homosexuality" that the prior acts of sodomy tended to prove that the defendant had committed the act with the victim. *Atkinson*, 293 S.W.2d at 943. The Court rejected the state's argument, noting that "the evidence did not disclose crimes that were so interrelated that proof of one would tend to establish the others." *Id.*

Other early cases that applied the common scheme or plan exception to prior sexual misconduct required that the prior sexual misconduct be part of the "same general criminal enterprise" that led to the sexual assault charged. *Buxton*, 22 S.W.2d at 637. In *State v. Kornegger*, 255 S.W.2d 765 (Mo.1953), the defendant committed an act of molestation against the victim. After the incident the defendant told the victim to meet him at the same place the following day. The defendant did not appear the following day but did appear the day after. The defendant again approached the victim, who had notified her parents, and after the defendant again exposed himself indecently to the victim the police arrested him. At trial the court admitted testimony concerning the subsequent incident of exposure. This Court affirmed the decision of the trial court under both the common scheme or plan and the identity exceptions. This Court found that the acts were connected by the defendant's request that the victim meet him again and also tended to show that the person who committed the second incident of exposure also committed the first act of molestation charged in the information. *Id.* at 769.

In *State v. Shumate*, 478 S.W.2d 328, 330 (Mo.1972), the victim testified that the defendant and others abducted her and during the following hours repeatedly sexually attacked her. The Court found that the victim's testimony regarding sexual attacks other than those charged that were committed during her captivity were properly admitted into evidence. "The facts reveal that prosecutrix was the victim of a common plan or scheme of a continuing nature involving sexual excesses committed by several persons at different places over a considerable period of time." *Id.* at 330; *see also State v. Torrence*, 519 S.W.2d 360, 361 (Mo.App.1975).

In *State v. Davis*, 540 S.W.2d 122 (Mo. App.1976), the defendant raped his daughter, then later in the day forced her into an act of oral copulation. The defendant was charged with immoral intent, § 563.160, RSMo 1969, based on the oral copulation. The court affirmed the trial court's decision to admit the testimony of the victim regarding the rape that occurred earlier in the day. The court found that the prior sexual attack by the defendant on the victim was admissible under common scheme or plan because "[b]oth the intercourse and the attempted sodomy occurred when the victim had been sent to spend the weekend with her father. Both acts occurred within a 12–hour period.... These circumstances indicate that both sexual assaults resulted from a plan by defendant to exercise control and custody over the victim and make her the target of his sexual excesses." *Id.* at 124.

Finally, in *State v. Dalton*, 587 S.W.2d 644 (Mo.App.1979), the court affirmed the trial court's admission of evidence of various acts of sexual misconduct committed against two brothers, placed briefly in the care of the defendant. The court found the evidence admissible under the common scheme or plan exception in part because the defendant exercised control and custody of the boys and in part because the various acts of sexual misconduct, both charged and uncharged, occurred during an approximately one-hour period. *Id.* at 645.

*Kornegger, Shumate, Davis,* and *Dalton* applied the common scheme or plan exception in situations in which the prior acts of sexual misconduct sought to be admitted into evidence occurred: (1) against the victim (or in the case of *Dalton,* victims); (2) from one hour to several days before or after the sexual misconduct for which the defendant was on trial; and (3) except for *Kornegger,* within the same period of "custody and control" that eventually led to the charged criminal sexual act. In *Kornegger,* the incidents were connected by the defendant's request to the victim to meet him the following day. These cases applied the traditional common scheme or plan exception since the prior misconduct about which the victim was allowed to testify occurred as a part of the "same criminal enterprise," referred to by Judge Thomas as "a single plan case," *Sladek,* 835 S.W.2d at 315 (Thomas, J. concurring), that led to the charged sexual assault.

*State v. Koster,* 684 S.W.2d 488 (Mo.App. 1984), purporting specifically to rely upon *Dalton,* significantly expanded the scope covered by the common scheme or plan exception beyond that traditionally allowed. The defendant was a house parent at a juvenile detention center. He used his position of authority to assault sexually a minor female confined at the center. The trial court allowed the testimony of three other residents of the detention center who testified that over a period of several months the defendant had made sexual advances toward them. The court of appeals affirmed, finding that the evidence indicated a common scheme or plan by the defendant "to exercise control and custody over his wards and to make them the target of his sexual excesses." *Koster,* 684 S.W.2d at 490. The *Koster* court also relied upon the identity exception of *Young* and *McDaniels* to find the evidence admissible even though the identity of the defendant in *Koster* was not in question. *Koster,* 684 S.W.2d at 491.

After *Koster* the court of appeals regularly recognized that a defendant's sexual misconduct with those other than the victim and separated by a period of time could be considered part of a common scheme or plan to abuse sexually children within the defendant's custody and control.[2] The cases required that the sexual misconduct be similar in nature but did not require a showing that the prior sexual misconduct is so "unusual and distinct" as to be a signature of the defendant and his activities. *See Erickson,* 793 S.W.2d at 383; *see also State v. Clay,* 686 S.W.2d 516, 517 (Mo. App.1985). As the court of appeals noted in *State v. Brooks,* 810 S.W.2d 627 (Mo. App.1991), the result has been that "the common scheme or plan exception [is] being conflated or mixed with the identity exception; the definitional lines separating these two exceptions [has] become blurred; and the trial court admits evidence of other crimes without a clear rationale for doing so." *Id.* at 633.

After *Koster* the focus in analyzing the common scheme or plan exception has shifted from whether the defendant committed the prior sexual conduct within the

---

2. *See State v. Jones,* 835 S.W.2d 376, 377 (Mo. App.1992); *State v. Gregory,* 832 S.W.2d 526, 528–29 (Mo.App.1992); *State v. Askew,* 822 S.W.2d 497, 500 (Mo.App.1991); *State v. Barnard,* 820 S.W.2d 674, 678 (Mo.App.1991); *State v. Erickson,* 793 S.W.2d 377, 383 (Mo.App.1990); *State v. Shaline,* 793 S.W.2d 167, 170–71 (Mo. App.1990); *State v. Fraction,* 782 S.W.2d 764, 768 (Mo.App.1990); *State v. Christeson,* 780 S.W.2d 119, 122–123 (Mo.App.1989); *State·v. Kerr,* 767 S.W.2d 344, 345 (Mo.App.1989); *State v. Dee,* 752 S.W.2d 942, 947–48 (Mo.App.1988); *State v. Taylor,* 735 S.W.2d 412, 418 (Mo.App. 1987); *State v. V___ C___,* 734 S.W.2d 837, 843 (Mo.App.1987); *State v. Muthofer,* 731 S.W.2d 504, 508–09 (Mo.App.1987); *State v. Smith,* 694 S.W.2d 901, 902 (Mo.App.1985); *see also State v. D.A.R.,* 752 S.W.2d 910, 912 (Mo.App.1988).

context of the activity that led to the crime charged to whether the defendant over the course of several months or years systematically engaged in similar sexual conduct with other victims under his "custody and control." *See e.g. Erickson,* 793 S.W.2d at 383. *Koster* and ·the subsequent cases have in essence converted the traditional common scheme or plan exception into a "series-of-similar-crimes" exception. *Brooks,* 810 S.W.2d at 633.

In *State v. Lachterman,* 812 S.W.2d 759 (Mo.App.1991), the Court of Appeals, Eastern District, directly confronted the distortion. The court held that cases using the "common scheme or plan exception as a means of demonstrating the relevance of uncharged acts of sexual abuse of equat[ing] similarity of conduct with common scheme ... distort[ ] the common scheme or plan exception." *Id.* at 767. According to *Lachterman:*

> [t]o say the similarity of defendant's conduct with the victim and with others shows a common scheme or plan embracing the commission of two or more crimes so related that proof of one tends to establish the other is tantamount to saying that the defendant's scheme or plan was to fulfill his propensity, proclivity or disposition toward such deviant behavior.

*Id.* at 768.

*Lachterman* properly refused to apply the common scheme or plan exception, but the court affirmed the trial court's decision to admit evidence of prior sexual abuse by the defendant of children other than the victim under a new exception. The *Lachterman* court held that "[e]vidence of repeated acts of sexual abuse of children demonstrates, per se, a propensity for sexual aberration and a depraved sexual instinct and should be recognized as an additional distinct exception to the rule against the admission of evidence of uncharged crimes." *Id.* at 768; *see also State v. Taylor,* 735 S.W.2d 412, 417 (Mo.App.1987). The court limited the depraved sexual instinct exception to "other acts of sexual abuse of children of the same sex as the victim occurring near the time of the acts

charged." *Lachterman,* 812 S.W.2d at 769.

This Court agrees with the *Lachterman* court that admission of prior sexual misconduct of the defendant with persons other than the victim under the common scheme or plan exception is a distortion of that exception as traditionally interpreted; it is contrary to *Atkinson, Kornegger, Shumate, Davis* and *Dalton.* The common scheme or plan exception has become instead "a series of crimes theory," and the evidence of prior misconduct is admitted more to prove that the defendant had a propensity to engage in the deviant sexual behavior than to prove a common scheme or plan that connects the misconduct with the present crime. *See Brooks,* 810 S.W.2d at 633. The exception, in effect, engulfs the rule. *Koster* and its progeny incorrectly interpreted and applied the common scheme or plan exception and, in this regard, should no longer be followed.

■ Although the *Lachterman* court was clearly seeking to provide legitimacy in the midst of disarray, this Court determines not to adopt the "depraved sexual instinct" exception articulated in *Lachterman.* As Judge Thomas observed in *Sladek:*

> The titles sound generic, but if they are applied broadly and generically without consideration for the underlying theory and reasoning, they will often be improperly applied. This application can easily cause an exception to become so broad that it swallows up the underlying rule of exclusion.

*Sladek,* 835 S.W.2d at 315 (Thomas, J. concurring). A blanket rule allowing evidence of any recent misconduct by the defendant with a child of the same sex as the victim may encourage the jury to convict the defendant because of his propensity to commit such crimes without regard to whether he is actually guilty of the crime charged. *See* Imwinkelreid, *Uncharged Misconduct Evidence,* § 4.16 (1990); *People v. Lewis,* 69 N.Y.2d. 321, 514 N.Y.S.2d 205, 506 N.E.2d 915, 918–19 (1987).

■ This Court's refusal to adopt the "depraved sexual instincts" exception does

not, however, automatically require exclusion of all evidence of prior misconduct. In *Sladek* Judge Thomas suggested it appropriate to recognize a separate exception for "signature *modus operandi*/corroboration" evidence. *Sladek*, 835 S.W.2d at 314–15 (Thomas, J. concurring). The signature *modus operand*/corroboration exception approximates the long established, well recognized exception that allows evidence of prior uncharged misconduct for the purpose of proving the identity of the wrongdoer. If the identity of the wrongdoer is at issue, the identity exception permits the state to show the defendant as the culprit who has committed the sexual crime charged by showing that the defendant committed other uncharged sexual acts that are sufficiently similar to the crime charged in time, place and method. *State v. McDaniels*, 668 S.W.2d 230, 232–33 (Mo. App.1984); *State v. Young*, 661 S.W.2d 637, 639 (Mo.App.1983). For the prior conduct to fall within the identity exception, there must be more than mere similarity between the crime charged and the uncharged crime. The charged and uncharged crimes must be nearly "identical" and their methodology "so unusual and distinctive" that they resemble a "signature" of the defendant's involvement in both crimes. *McDaniels*, 668 S.W.2d at 232–33; *Young*, 661 S.W.2d at 639; *see Sladek*, 835 S.W.2d at 317 (Thomas, J. concurring).

▮ In the context of corroboration, evidence of prior crimes is logically relevant in that it has a legitimate tendency to prove a material fact in the case by corroborating the testimony of the victim as to the sexual assault. *See Sladek*, 835 S.W.2d at 314 (Thomas, J. concurring); *see also State v. Garner*, 481 S.W.2d at 241. Because of the secretive nature of the crime in most cases involving sexual abuse or molestation of a child by an adult, the only eyewitnesses to the crime are the defendant and the victim. Imwinkelreid, *Uncharged Misconduct Evidence*, § 4.13 (1990). The trial often becomes a credibility contest between the defendant and the victim. *Id.* Evidence of prior crimes in such situations, is, therefore, probative.

▮ Evidence of prior crimes is legally relevant, thus admissible, however, only if the probative value of the evidence outweighs its prejudicial effect. *See Sladek*, 835 S.W.2d at 314–15 (Thomas, J. concurring). Judge Thomas cautioned against using corroboration evidence casually because:

> [a]lthough we have called this exception corroboration, it really involves reasoning from the signature modus operandi based upon the propensity of the defendant to commit this type of crime to the conclusion that the defendant committed the crime charged. This reasoning goes squarely against the rationale for the general rule. This makes it particularly important that the requirement for a signature modus operandi be strictly enforced.

*Id.* For corroboration evidence to be of sufficiently increased probative value so as to outweigh its prejudicial effect, the evidence must be more than merely similar in nature to the sexual assault for which the defendant is charged. *See Sladek*, 835 S.W.2d at 317. (Thomas, J. concurring). Evidence of prior sexual misconduct that corroborates the testimony of the victim should be nearly identical to the charged crime and so unusual and distinctive as to be a signature of the defendant's *modus operandi*. *Id.* This is a threshold requirement that must be met before the trial court can proceed to weigh any additional factors in determining the question of admissibility.

For the reasons stated above, and subject to the constraints delineated there, this Court adopts a signature *modus operandi*/corroboration exception to the rule prohibiting evidence of prior uncharged misconduct. It remains to examine the testimony at issue in view of the prohibition against evidence of prior uncharged misconduct and to determine whether the signature *modus operandi*/corroboration exception is applicable in the present case.

▮ The subject testimony was adduced from four witnesses who were members of a youth group in a church in which appellant previously served as pastor. An-

drew[3], age 27 at the time of the trial, testified that he had first contact with appellant in 1977 or 1978, when Andrew was 13 or 14 years old. According to Andrew, appellant organized an "initiation" ritual for certain members of the youth group, in the "Dare Club," requiring them to sit naked upon the hood of a slow-moving car driven by appellant. Andrew participated in this ritual. Andrew testified that on other occasions, after the conclusion of a youth activity, appellant asked several of the male members of the group to remain. Appellant held down members of the group and poured ice cream topping on their bodies. Andrew testified that appellant placed a small candle in the anus of a male member of the youth group.

Andrew testified that appellant on three different occasions touched Andrew's genitals, causing appellant to ejaculate, the first time while appellant slept with Andrew in a hotel in southern Missouri, the second time when Andrew spent the night at appellant's house and the third time during the lock-in of the youth group at the church. According to Andrew, appellant kept a set of polaroid photographs of nude young men in his desk at work.

Bob, 26 years old at the time of trial, testified that he began attending the youth group in which appellant previously served as pastor when Bob was age 14. Bob testified that he and another friend went though an initiation process of jogging naked in front of a car driven by appellant, while other boys rode in the car watching. Bob testified that appellant showed him polaroid pictures of other young men, unclothed, whom Bob knew at school, as well as one photograph of appellant naked. According to Bob, while spending the night at appellant's house, appellant got into bed with Bob and touched his genitals. Bob left the bedroom and slept on a couch in the living room while appellant remained in the bedroom.

Charles, 25 years old at the time of trial, testified that he began attending appellant's youth group when he was twelve. Charles testified that he participated in an "initiation" in which appellant organized masturbation parties where male members of the youth group were supposed to stand on the church pulpit and achieve an erection. Charles observed another initiation, similar to those about which Andrew and Bob testified, in which appellant had new members of the group strip naked and run in front of a car driven by appellant, with other boys riding in the car.

According to Charles, appellant directed one boy to place ice cream syrup at the end of his, the boy's, penis and directed another boy to lick it off. On another occasion, appellant had Charles and another boy put lotion on their penises and try to masturbate. Later that same evening, appellant tied Charles to a table, blindfolded him, put ketchup and mayonnaise on his penis, cut Charles free, and then told him to masturbate. Charles masturbated to the point of ejaculation and the appellant took the semen and wiped it on Charles's lips. Charles also testified that on another occasion appellant spent the night with Charles, touched Charles's genitals, masturbated Charles.

Don, age 25 at the time of trial, testified that he began attending appellant's youth group when he was 12 or 13 years old. Don testified that appellant initiated him into the youth group by requiring him to run naked in front of a car driven by appellant; three or four other youth were present in the car. There were three additional incidents. According to Don, appellant required male members of the youth group to go naked up onto the stage in the church sanctuary, achieve erections and then hang a tennis shoe from their penises. Don also testified that appellant paired male members of the group and had them kiss each other and lick ice cream toppings from each other's genitals. Male members of the group were encouraged by appellant to perform the "elephant" walk, unclothed from the waist down, with males walking in a line holding the penis of the boy in front. Don testified that appellant showed him polaroid photos of male members of the youth group, naked or partially naked, and

---

**3.** The actual names of the four witnesses are other than those used in this opinion.

encouraged Don to allow him to take a nude photograph of Don. Appellant also encouraged Don to masturbate but Don refused both to pose for appellant or to masturbate.

There are strains of commonality in the testimony of Andrew, Bob, Charles and Don. Only one type of uncharged act, however, is not only nearly identical to the others but also so unusual and distinctive that the prior acts resemble the signature of the defendant's involvement in the present crime. To recapitulate, the victim in the present case testified that appellant, while driving around, asked the victim to take off his clothes and run around appellant's car or, if not, to walk around the car in his underwear. Charles testified that he rode in a car with appellant and observed two other boys stripped and running naked in front of the car as the vehicle followed behind them with the lights on, all at appellant's direction. Bob and Don testified that appellant asked them to run naked in front of a slow moving car. Andrew's testimony, slightly dissimilar, was that appellant asked him to sit naked upon a slow moving car while appellant drove.

Appellant's conduct involving his preference for naked or partially clothed boys in motion on or around an automobile is more than merely similar in nature to the sexual assault with which appellant is charged; it operates as a "signature" of appellant's involvement in both crimes. Appellant's conduct in this respect is so unusual and distinctive as to "earmark" it as the conduct of the accused and, thus, to corroborate the testimony of the victim in the present case. *See McDaniels*, 668 S.W.2d at 233. The evidence is admissible.

■ No other evidence adduced by Andrew, Bob, Charles, or Don is admissible. The state suggests that Andrew, Bob and Don's testimony that appellant possessed and showed nude photographs of members of the youth group, as well as Andrew, Bob and Charles's testimony that appellant arranged sleepovers with them in order to abuse them sexually, is similar to the misconduct in the present case in which appellant arranged for the victim to sleep over

with him and also took a photograph of the victim in his underwear. Although the conduct is similar, even nearly identical, it is not so unusual and distinctive as to be a signature of appellant's *modus operandi.*

■ Appellant cites *State v. Cutler*, 499 S.W.2d 387, 388 (Mo.App.1973), and *State v. Courter*, 793 S.W.2d 386, 390 (Mo. App.1990), arguing that all of the events portrayed by the testimony of the four witnesses are too remote in time from the crime charged to be admissible. The holdings of *Cutler* and *Courter* were correct under the traditional common scheme or plan exception allowing admission of evidence of prior misconduct only if it were part of, or connected to, the same general criminal enterprise; remoteness in time can make difficult, or even impossible, proof of a traditional common plan or scheme between separate acts of misconduct. Under the signature *modus operandi*/corroboration exception, however, it rests in the sound discretion of the trial court to determine whether the passage of time between incidents is so lengthy that the prejudice or other "cost" of the evidence outweighs the probative value of the signature *modus operandi*. *Sladek*, 835 S.W.2d at 317 (Thomas, J. concurring). A prior crime nearer in time to the charged crime is clearly more relevant. *Id.* The number of unusual and distinctive incidents that occurred in the past should also be taken into account by the trial court; the greater the number, the more weight given to them. *Id.*

■ The testimony of Andrew, Bob and Don concerning their running naked in front of, or sitting naked upon, an automobile, and of Charles, concerning his direct observation of the others engaged in the same act, all at appellant's direction, is not too remote in time to admit. Although the events about which the four testified occurred between 12 and 13 years prior to the trial in the present case, the remoteness is outweighed by there being at least four nearly identical incidents so unusual and distinctive as to corroborate the victim's testimony. The remoteness is not a bar in this case to the admission of the evidence

that is admissible under the signature *modus operandi*/corroboration exception. On remand the state may call Andrew, Bob, Charles and Don to testify concerning the incidents in which appellant directed youth to run naked in front of or sit naked upon a slow-moving car driven by the appellant.

The remainder of the testimony of the four witnesses is inadmissible. Some bears no similarity to the conduct with which appellant is charged in the present case. Some is insufficiently unusual or distinctive, although similar. All occurred on occasions separate from the "signature" incidents. The evidence is prejudicial, and its admission requires reversal and remand for a new trial.

## II.

*Appellant raises two additional points on appeal, each of which may recur on retrial.*

### A.

■ Appellant argues that his convictions for both sexual abuse in the first degree and attempted forcible sodomy violate the double jeopardy clauses of the Missouri and United States Constitutions. Appellant contends that the two charges are essentially the same offense because each requires forcible compulsion and sexual contact, the only difference between the charges being that attempted forcible sodomy requires an additional element of deviate sexual intercourse.

Appellant was charged in Count I of the substitute information with sexual abuse in the first degree on the theory that he had subjected the victim "to sexual contact without his consent by the use of forcible compulsion," in violation of § 566.100.1(1).[4] Section 566.010.1(3), RSMo 1986, defines "sexual contact" as "any touching of the genitals or anus of any person, or the breast of any female person, or any such touching through the clothing, for the purpose of arousing or gratifying sexual desire of any person." Appellant was con-

victed of first degree sexual abuse based upon the evidence that appellant had touched the victim's penis with his erect penis.

Appellant was convicted under Count II of attempted forcible sodomy based on the allegation that appellant "attempted to have deviate sexual intercourse with ... [the victim] by the use of forcible compulsion: in violation of § 566.060.1." Section 566.010.1(2) defines "deviate sexual intercourse" as "any sexual act involving the genitals of one person and the mouth, tongue, hand or anus of another person...." Appellant was convicted for attempted forcible sodomy because he touched the victim's penis with his hand.

Double jeopardy is not a bar to either of appellant's convictions. Appellant was convicted of the two offenses because he committed two separate criminal acts. He was convicted of first degree sexual abuse because he touched the victim's genitals with his erect penis, and he was convicted of attempted forcible sodomy because he touched the victim's genitals with his hand. Appellant committed two distinct crimes resulting from separate acts involving different parts of his body. Each offense involved an episode of distinct conduct. The double jeopardy clause does not prevent appellant from being prosecuted and convicted for committing these separate acts. *See State v. Heslop*, 842 S.W.2d 72, 76 (Mo. banc 1992). *See also State v. Hagan*, 836 S.W.2d 459, 463 (Mo. banc 1992). Appellant's argument that the double jeopardy clause prohibits both convictions is without merit.

### B.

■ Appellant also contends that the state introduced insufficient evidence to support the jury's conclusion that he used "forcible compulsion" in committing sexual abuse in the first degree and attempted forcible sodomy. His contention is incorrect.

---

**4.** Section 566.100.1 provides:

> A person commits the crime of sexual abuse in the first degree if:

> (1) He subjects another person to whom he is not married to sexual contact without that person's consent by the use of forcible compulsion....

Appellate courts view all evidence and reasonable inferences from the evidence in the light most favorable to the verdict, and all contrary evidence is rejected. *State v. Feltrop*, 803 S.W.2d 1, 11 (Mo. banc 1991). Review is limited to determining whether substantial evidence existed from which a jury could conclude that the defendant is guilty beyond a reasonable doubt. *State v. Dulany*, 781 S.W.2d 52, 55 (Mo. banc 1989). "Forcible compulsion" is defined in part as "physical force that overcomes reasonable resistance." § 556.-061(12)(a). There is substantial evidence in the record to support the jury's conclusion that appellant used "forcible compulsion" when committing the acts for which he was charged.

The evidence discloses that after the two young women exited appellant's vehicle and entered their college dormitory, appellant drove the vehicle with the victim as a passenger until the victim did not know where he was. The victim testified that he became frightened. At the motel room, appellant feigned that someone would soon arrive. When no one came, appellant convinced the victim to play "strip rummy." After removing all clothing but underwear, appellant suggested that he and the victim sleep, both occupying a single bed. During the night appellant caressed the victim's back, arms and chest. The victim was frightened. When appellant moved his hands to the victim's genitals, the victim was physically unable to push appellant's hand away, although he tried. The victim attempted unsuccessfully several times to prevent appellant from touching him. The evidence reflects that appellant used physical force against the victim that overcame reasonable resistance by the victim, thereby supporting the jury's determination that appellant used "forcible compulsion" in the commission of the crimes.

### III

The judgment is reversed and the cause remanded for a new trial.

HOLSTEIN, BENTON and PRICE, JJ., concur.

ROBERTSON, C.J., concurs in part and concurs in result in part in separate opinion filed.

THOMAS, J., concurs in part and concurs in result in part in separate opinion filed.

LIMBAUGH, J., concurs in opinions of ROBERTSON, C.J., and THOMAS, J.

ROBERTSON, Chief Justice, concurring in part and concurring in result in part.

The majority reverses the conviction of Larry Bernard and remands this case for a new trial. In this I concur. I also concur in the majority's conclusions regarding Bernard's sufficiency and double jeopardy arguments. I disagree, however, with the majority's creation of a new exception to the rule excluding evidence of prior crimes.

Child abuse and sexual molestation are crimes that deserve society's deepest outrage and most stern punishments. Because of the outrage we justifiably feel when confronted with these crimes, there is a grave danger that we will allow them to alter our commitment to basic evidentiary concepts designed to guarantee due process. Cases like this one appeal to "the feelings and distort[ ] the judgment. These immediate interests exercise a kind of hydraulic pressure ... before which even well settled principles of law will bend." *Northern Securities Co. v. United States*, 193 U.S. 197, 400–01, 24 S.Ct. 436, 487, 48 L.Ed. 679 (1904) (Holmes, J., dissenting). Regretfully, the hydraulic pressure of outrage we feel when a person exercises his position of authority to abuse children sexually has resulted in a rule that places a defendant's right to a fair trial in jeopardy.

### I.

This Court is properly reluctant to bar any relevant evidence from the jury's consideration. I believe, however, that none of the testimony of the Weston witnesses should be admitted on remand. I do not argue that prior crimes evidence is somehow irrelevant to establishing guilt. Such evidence provides, at a minimum, an inference that the defendant has a propensity for criminal behavior. The more similar

the prior bad acts are to the crime charged, the stronger this inference. Where the propensity and the charges both concern a very distinct type of criminal behavior, the inference is even stronger.

The rule prohibiting evidence of prior bad acts, however, is founded on the belief that, whatever small measure of *logical* relevance propensity provides, it carries with it such inordinately high risks of abuse that such evidence lacks *legal* relevance and should be barred. These risks are: (1) that the introduction of evidence of other crimes will mislead or confuse the jury, (2) that the jury will give undue weight to the "if he did it once, he'll do it again" inference, (3) that the defendant will be made to defend, not just against the charges brought, but against all of his prior, similar behavior which, for whatever reason, was not prosecuted by the State, and (4) that the jury, in its rush to punish the defendant for his past acts—which the jury must infer have gone unpunished—may overlook the fact that the State has failed to prove the defendant was guilty of the charges brought. Clearly, the most potent of these risks is the last. To avoid these risks and to ensure each defendant a fair trial in which guilt or innocence may be determined on the basis of evidence of the charged crimes· and not of general propensity or bad character, courts have generally said that where evidence is relevant only to show the defendant's propensity to commit the type of crimes charged, such evidence may not be admitted.

This Court recently rededicated itself to this general rule in *State v. Sladek*, 835 S.W.2d 308 (Mo. banc 1992). There, evidence that a dentist had fondled the breasts of four previous patients was held inadmissible in the trial of that dentist on charges that he drugged, raped and sodomized a fifth patient. "The well established general rule is that proof of the commission of separate and distinct crimes is not admissible unless such proof has some legitimate tendency to directly establish the defendant's guilt of the charge for which he is on trial." *Id.* at 311 (*quoting State v. Reese*, 364 Mo. 1221, 274 S.W.2d 304, 307 (1954). Where the relevance of such evidence is confined simply to raising the inference that "if a person will commit one offense, he will commit another," the evidence must be barred. *Id.* (*quoting State v. Spray*, 174 Mo. 569, 74 S.W. 846 (1903)). *Sladek* held that the testimony of the four prior victims had no legitimate tendency to establish guilt directly and should have been excluded. *Id.* at 313. The Court determined that the evidence had no use other than to raise in the mind of the trier-of-fact the inference that any dentist who would fondle the breasts of four patients is probably guilty of raping a fifth. Indeed, the judge in that court-tried case was thus persuaded and specifically rested his finding of guilt on the strength of the evidence of prior bad acts. A new trial, therefore, was required. *Id.*

Judge Thomas concurred in *Sladek* to express his views on the shortcomings of the analysis used to judge the admissibility of this type of evidence. *Sladek*, 835 S.W.2d at 313–18. The concurrence reminds us that "relevance" has both a "logical" and "legal" component. *Id.* at 313. Evidence of other crimes may be logically relevant in many ways. Evidence acquires legal relevance, however, only when the probative value of its logical relevance outweighs the danger of unfair prejudice created by the propensity inference. *Id.* at 313–14.

Judge Thomas' opinion argues for a new exception to the rule against prior bad acts evidence, which he termed "signature modus operandi/corroboration" evidence. Under that exception, Judge Thomas urged that evidence of prior bad acts should be admitted when the evidence is so similar to the charged conduct that it has a logical tendency to corroborate the victim's story. This corroboration, stated Judge Thomas, provides sufficient probative value on the issue of the victim's credibility to outweigh the unfair prejudice that results from propensity evidence. Having thus created a new category of exception to the general rule excluding evidence of prior bad acts, Judge Thomas candidly admitted that:

This particular exception runs a greater risk of ... abuse than the other excep-

tions because the issue upon which the evidence is being admitted is the same in both the exception and the general rule. Although we have called this exception corroboration, it really involves *reasoning from the signature modus operandi based upon the propensity of the defendant to commit this type of crime to the conclusion that the defendant committed the crime charged. This reasoning goes squarely against the rationale for the general rule.*

*Id.* at 317. [Emphasis added.] I could not express the basis for my disagreement with the majority today with half the eloquence of Judge Thomas. In my view, the dangers of propensity evidence in this case far outweigh its benefits. The majority disagrees and adopts Judge Thomas' "corroboration" exception as the law of Missouri.

II.

Even without rearguing the fundamental tenets of the rule against prior crimes evidence, there are three strong arguments against legitimizing this "corroboration" exception. First, such evidence has no direct logical relevance to anything other than the defendant's propensity. In *Sladek,* the Court held that evidence of prior crimes is inadmissible unless it has "a legitimate tendency to *directly* establish guilt." *Sladek,* 835 S.W.2d at 311. [Emphasis added.] *Sladek* bases this statement on the general rule that such evidence, if it is to be admitted, must be relevant to some material issue. Establishing the credibility of the victim, even assuming that the testimony of the Weston witnesses does so, does not *directly* establish guilt nor is the victim's credibility a *material* issue. The facts to which a victim testifies are clearly material; the victim's credibility, however, only determines the weight the jury will accord his or her testimony and, while that is important, it is not material.

Second, the portion of the victim's story that the majority asserts is made more believable by the prior crimes evidence is not material to the crimes charged. Acknowledging that the lion's share of the Weston witnesses' testimony must be excluded under any rationale, the majority has determined that portions of each of the four boys' testimony should be admitted on retrial. The majority's rule renders admissible the testimony that Bernard, eight-to-ten years earlier, asked three of the Weston witnesses to either run naked in front of, or sit naked on the hood of, his car and that the fourth Weston witness observed others doing so. This evidence, the majority declares, is "so unusual and distinctive as to 'earmark' it as the conduct of the accused and to corroborate the testimony of the victim in the present case." Maj. op. at 19. Therefore, the majority concludes that when the jury has been apprised of this prior, uncharged behavior, it will be more likely to believe the present victim when he testifies that Bernard asked him to run or walk around Bernard's car in his underwear. Overlooked by the majority, however, is the fact that Bernard is not charged with having asked the victim to run around the car in his underwear. From this it must be concluded, though the majority does not admit, that the probative value on the issue of the victim's credibility, which the majority believes outweighs the obvious prejudice of any of the Weston evidence, lies not in its corroboration of any material fact, but rather of a collateral fact.

Finally, but most fundamentally, I respectfully submit that the majority misconceives the nature of corroboration or corroborative evidence. "To corroborate," means "to correspond with the representation of some other witnesses, or to comport with some facts *otherwise known or established.*" Black's Law Dictionary 344 (6th ed. 1990). [Emphasis added.] "Corroborating evidence" is "[e]vidence supplementary to that already given and tending to strengthen or confirm it. Additional evidence of a different character *to the same point.*" *Id.* [Emphasis added.] Thus, when one witness testifies that he saw a crime committed at a particular time and place, and another witness testifies that he saw the first witness at that time and in that place, the first witness' testimony can be said to have been corroborated to some

degree by that of the second witness. Similarly, when the victim in the present case testifies to having been upset by the events and the victim's parents testify that when he showed up at the restaurant he appeared to be upset, the victim's testimony can thus be said to have been corroborated in some measure.

The Weston witnesses, however, each testified to events other than, and not particularly similar in setting to, that to which the present victim testified. Therefore, it cannot be said that the testimony of the Weston witnesses directly corroborates the testimony of the victim in this case. I would argue, and Judge Thomas tacitly admits in *Sladek*, that the only corroboration supplied in this situation is *indirect* corroboration. Indirect corroboration occurs when the jury, which has already determined guilt based on the defendant's propensity as demonstrated by his prior crimes, believes the victim because his story is consistent with guilt. In other words, the logical path by which the State seeks to bolster the victim's credibility is: (1) those four boys said Bernard did these things, (2) therefore, he did do them, (3) therefore, he is the type who does these things (4) "everybody knows" that the type of person who does these things is likely to do them again, (5) therefore, it can be concluded that Bernard did do them again, and (6) therefore, when the victim says he did them, the victim must be telling the truth. Thus, the sixth and final step of the jury's process, corroboration, which is the driving force behind the majority's ruling of admissibility, is actually unnecessary because the jury first had to determine Bernard's guilt (step five) in order to have any reason to credit the victim's credibility.

### III.

The legislature has not seen fit to make a person's propensity for sexual abuse or molestation of children a crime, nor an element of any crime. Rather, it has chosen to punish each such act individually and then only when proven in court and before a jury. The majority cites the secretive nature of these crimes, and the State's corresponding difficulty in overcoming the defendant's presumption of innocence, as support for its decision to admit evidence which establishes only the defendant's propensity. I do not believe that these difficulties can have escaped the attention of the legislature or that this Court should condone the use of evidence that virtually begs the jury to punish the defendant for reasons other than those the legislature has authorized.

Having discarded, in principle, the rule against evidence that only establishes propensity, the majority attempts to redeem itself by setting high prerequisites of similarity for admissibility. Thus, under the majority's reasoning, evidence ordinarily not admissible because it serves only to establish the defendant's propensity for criminal behavior is somehow rendered admissible if it strongly establishes that propensity. Nor are Bernard's hopes of a fair trial on remand significantly strengthened by the majority's holding that most of the testimony of the Weston witnesses is inadmissible. To be certain, the jury will be spared the day-long string of horror stories reflected in the present transcript. I doubt, however, that these are any worse than what we are inviting the jury to imagine happened by allowing these boys to testify that ten years ago Bernard had them run naked in front of his car ... and then step down.

A close review of the record in this case, without reference to the Weston witnesses' testimony, reveals that the State presented sufficient direct evidence of the defendant's guilt to justify submitting this case to a jury. I would reaffirm the time-tested rule against the use of prior crimes evidence and apply it to *all* of the Weston witnesses' testimony on remand.

THOMAS, Judge, concurring in part and concurring in result in part.

I concur in part and concur in the result reached in the majority opinion, and I concur in the conclusion reached by Chief Justice Robertson in his separate opinion that none of the testimony of the four witnesses referred to in the majority opinion as An-

drew, Bob, Charles and Don is admissible because I conclude that this evidence should not be admitted under any of the exceptions to the rule excluding evidence of prior criminal acts.

To assure that it not be otherwise lost in the details of the various opinions, I first point out that all of our opinions in this case are in agreement on the major thrust of our decision, which is that the Missouri prior-crimes cases, beginning with *State v. Koster*, 684 S.W.2d 488 (Mo.App.1984), and subsequent cases which relied upon *Koster* (see cases cited in footnote 2 on page 15 of the majority opinion), to expand the scope covered by the common scheme or plan exception will no longer be followed. I also agree with the majority opinion that Missouri should not recognize or follow an independent exception in a child sexual abuse case for evidence of prior sexual abuse by the defendant of children other than the victim as discussed in *State v. Lachterman*, 812 S.W.2d 759 (Mo.App. 1991). We are in full agreement that to the extent these cases have expanded the exceptions for the admission of evidence of prior crimes, we will now pull back to a more traditional rule in this area. The basic difference between the majority and the concurring opinions is how far we should pull back and, in particular, whether we should recognize an exception for signature crimes when the issue is whether the crime occurred.

In my concurring opinion in *State v. Sladek*, 835 S.W.2d 308, 314 (Mo. banc 1992), I called this type of case "signature modus operandi/corroboration," or signature crimes/corroboration. Chief Justice Robertson takes issue with the appropriateness of the term "corroboration," and it may be true that some other title for this type of case would be more accurate and helpful. However, for the time being, I will continue to use that label rather than to inject the confusion of a new title. The more important inquiry is whether this type of case justifies an exception to the prior crimes rule and, if so, what is the rationale for that exception?

In dicta in my concurring opinion in *Sladek*, I pointed out that the traditional prior crimes rule has recognized an exception for the admissibility of prior crimes where the issue is identity and the prior crime qualifies as a so-called "signature crime." As an example, I described *Jones v. State*, 460 So.2d 1384 (Ala.Cr.App.1984), where the defendant was charged with the robbery that occurred when the victim responded to a telephone call asking him to go to a certain Alabama farm to do some construction work. When the victim arrived, he was met by a man he identified as the defendant. This person took the victim into a barn where another man wearing a Halloween-type mask and black wig robbed him. During the robbery, the man wearing the mask and wig carried a long-barreled pistol, and the man identified as the defendant had a snub-nosed pistol, each of which was observed and described by the victim. The defendant denied that he participated in the robbery or had any knowledge of it. He claimed that the victim was mistaken in identifying him as a participant, and he attempted to establish an alibi through other witnesses.

The court admitted testimony by a criminal investigator from Tennessee who testified that two weeks later he went to a farm with another investigator, who posed as a cattle buyer. The investigators, who were invited to the farm by phone, were met by the defendant and taken into the barn where they were robbed by a man wearing a Halloween mask and a wig identical to those worn by the masked man in the charged crime. The guns used in the uncharged crime were seized and later identified by the victim as the same identical gun used by the man in the mask and wig in the case of the large-barreled pistol and as being of the same type used by defendant in the case of the snub-nosed pistol. The court admitted evidence of the uncharged crime under the signature crimes/identity exception to the general rule prohibiting admission of other or collateral crimes as substantive evidence of the guilt of the accused. The court observed that the uncharged crime is not admissible unless it and the now-charged crime "are 'signature

crimes' having the accused's mark and the peculiarly distinctive modus operandi so that they may be said to be the work of the same person." *Id.* at 1390.

In the dicta contained in my concurring opinion in *Sladek*, I compared the admissibility of evidence of prior crimes in a signature crimes/corroboration case with the admissibility of such evidence in a signature crimes/identity case. We can further evaluate this comparison in the context of the facts presented in the present case. I agree with the majority opinion that the defendant's conduct some ten years earlier in causing Bob, Charles and Don to run naked in front of a car and having Andrew ride naked on the hood of the car and the claimed conduct in the present case that the defendant requested the victim to take off his clothes and run or walk around the car are signature crimes. The issue then is whether the evidence of defendant's conduct ten years ago is sufficiently probative to outweigh the prejudice involved in admitting evidence of these earlier crimes. I concluded in my concurring opinion in *Sladek* that "the increased probative value that arises from the signature modus operandi to overcome the unfair prejudice in an identity case is probably equally strong in a case where it is offered to corroborate a victim's complaint." *Sladek*, 835 S.W.2d at 317. Having now considered that proposition further, I now conclude that the rationale and reasoning involved in a signature crimes/identity case is entirely different from that involved in a signature crimes/corroboration case. While the presence of a signature crime does add increased probative value on the identity issue, the fact that it is a signature crime that is unusual and unique really adds nothing to the probative value of such evidence where the issue is whether the defendant did what the victim claims he did.

In a typical identity case, the defendant concedes, or at least does not contest, that the crime occurred. His defense is: "It wasn't me." The signature crimes/identity exception says that if a prior crime is so unique and unusual that it becomes the "signature" of the person who committed it, and the defendant is identified as having committed the prior crime, then this evidence will be admitted as proof that it was the defendant who committed the unusual and similar crime now charged. Some courts have compared the signature crime to the defendant's fingerprint or to his signature. The reasoning is that the signature crime is so unique and unusual, as is a fingerprint, that the evidence shows this type crime to be the defendant's crime, then if this unusual act (or fingerprint) is shown to have occurred in a similar manner, this identifies the defendant as the perpetrator of that crime. Obviously, the more unique the crime, the stronger the identification. Most important, we need not rely upon the fact that the defendant performed this act on a prior occasion as proof that he chose to perform the act on this occasion since in this type of case it is a given fact that the act occurred; we are merely seeking to identify the actor.

The so-called signature crimes/corroboration case is different. Unlike the identity case where it is conceded that the unusual act occurred, in this situation the issue is whether the act did occur. The inquiry is not who did it; the inquiry is was it done. Chief Justice Robertson refers in his separate opinion to the rule that prior crimes evidence is not admissible if its only direct logical relevance is to the defendant's propensity to perform the charged crime. We can examine the probative value of propensity evidence by thinking carefully about the rationale involved. Human beings are creatures of choice; under normal circumstances, they operate upon their own free will and from day to day and time to time they make choices and decisions about what they will or will not do. The defendant in a criminal case is given the benefit of presuming that he acted by free choice. In fact, the absence of free choice, such as where duress is present, may even constitute a defense. Despite the fact that ten years ago the defendant may have asked Bob, Charles and Don to run naked in front of a car, we still afford the defendant the benefit of the presumption that he acted by free choice at the time of the charged crime. We require that the prosecution

prove beyond a reasonable doubt what choice the defendant made on the occasion of the charged crime. The fact that ten years ago the defendant may have asked Bob, Charles and Don to run naked in front of a car really has very little to do with whether the defendant chose on this occasion to ask the victim to take off his clothes and either run or walk around the car. The choices he made ten years ago have very little bearing on what choice he may or may not have made with the victim.

Moreover the fact that the charged crime is unusual or unique actually works against the likelihood that the charged crime occurred. Unlike the identity case where the uniqueness of the crime is the feature which identifies the defendant, in the corroboration case where we don't know whether the act occurred, the extent to which it is unusual, unique or impossible actually makes it less likely, not more likely, that it occurred. Thus, the signature nature of the crime, which makes it an identifying feature in an identity case, actually detracts from its probative value in a case where the issue is whether the act occurred. In the corroboration case, the fact that the act is unique or unusual does not add to the likelihood that the defendant on this occasion chose to engage in this activity. What it boils down to is that the only evidence that suggests it occurred on this occasion is the fact that the defendant chose to act in the same way ten years ago; this is pure propensity evidence and under the rule excluding mere propensity evidence it should not be admitted. In this respect and for this reason, I concur in the result Chief Justice Robertson reaches in his separate opinion.

I would limit the signature crimes exception to the case where it is conceded, or not seriously disputed, that the criminal act occurred and the only issue to be decided is whether the defendant is the person who performed that act. I would limit the common scheme and plan exception to those situations where the prior crime is part of a single plan that also encompasses the charged crime or is part of or preparation for the charged crime, such as where the defendant stole a gun from a pawn shop (the uncharged crime) so that he could use the gun to rob a bank (the charged crime), or other circumstances where there is a direct connection between the prior crime and the charged crime, such as in *State v. Kornegger*, 363 Mo. 968, 255 S.W.2d 765 (1953), discussed on page 14 of the majority opinion, where in the prior crime the defendant requested the victim to return on the occasion of the charged crime.

Hindsight being better than foresight, I regret having planted the seed for an exception for signature crimes/corroboration in *Sladek*, particularly since I am now unwilling to go forward with that exception. Having examined this issue further, I am now convinced it is not comparable to the identity exception. Since proposing that exception in *Sladek*, I have had the feeling that it would be a difficult rule to contain within specific bounds, and I am even more convinced of that fact having concluded that it is not supported by logic. I believe a rule that will admit signature crimes to prove identity only and the traditional application of the common scheme and plan exception as described in the majority opinion will be a workable rule for the trial courts and can be applied consistently.