

# In the
# Missouri Court of Appeals
# Western District

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | WD85526 |
| | ) | |
| v. | ) | OPINION FILED: |
| | ) | October 10, 2023 |
| JOSHUA ARMANDO ALDANA, | ) | |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Ray County, Missouri**
The Honorable David Harrison Miller, Judge

Before Division Four:  Gary D. Witt, Chief Judge, Presiding, Cynthia L. Martin, Judge,
and Chad Gaddie, Special Judge

Joshua Armando Aldana ("Aldana") appeals the judgment of the Circuit Court of

Ray County, Missouri ("trial court"), convicting him, after a jury trial, of three counts of

abuse of a child, section 568.060, and sentencing him to terms of five years, four years,

and five years, all to be served concurrently.  On appeal, Aldana alleges that the trial court:

(1) plainly erred in submitting the verdict director for count I in that it involved "multiple

acts" not requiring a unanimous jury verdict; (2) erred in submitting the disjunctive verdict

director for count I in that there was not sufficient evidence to support one of the

alternatives; (3) plainly erred in submitting the verdict director for count II in that the verdict director was not the correct MAI instruction and did not include the required cross-reference; (4) plainly erred in submitting the verdict director for count III in that the verdict director was not the correct MAI instruction and did not include the required cross-reference; (5) erred in failing to ensure that the complete text of certain mandatory jury instructions was submitted to the jury; and (6) erred in allowing into evidence testimony regarding a prior bad act of Aldana. We affirm the judgment of the trial court.

## Factual and Procedural Background[1]

On or about August 1, 2017, a woman in Ray County ("Babysitter") met Aldana, his then-wife, and two of his children, as she was to begin babysitting the children the next day. Babysitter noticed bruising on the little three-year-old daughter's ("Victim") face, but Victim's hair was in front of the bruising, and Babysitter believed it might be a birthmark. At the meeting, Aldana told Babysitter that Victim was potty trained, but that she had been having accidents. The next day, August 2, 2017, Aldana brought the children to Babysitter's house, and, before he left, he told Babysitter that he "took care of" the problem with Victim's accidents. After Aldana left, Babysitter noticed more bruising and red marks on Victim's face. The bruising on Victim's face varied in color, as if some bruises were older than others. Victim later complained that her stomach hurt, and she needed to use the bathroom. Babysitter heard crying from the bathroom, and when she checked on

---

[1] "On appeal from a jury-tried case, we view the facts in the light most favorable to the jury's verdict." *State v. Weyant*, 598 S.W.3d 675, 676 n.1 (Mo. App. W.D. 2020)(internal citation omitted).

2

Victim, Victim was having a hard time sitting on the toilet. Upon examining Victim, Babysitter saw bruising down Victim's lower back and bottom. "And she couldn't even sit down because it hurt that bad." Babysitter asked Victim how she got the bruises, and Victim answered that her dad screamed at her a lot, that her dad was scary, and that he had hit her. Babysitter took pictures of the bruises on Victim's face, but she did not feel that it was appropriate to take pictures of the body of a three-year-old that she had just met. The pictures of Victim's face showed some bruising in several places, some splotching or petechiae, and some red hemorrhagic spots in Victim's eyes. Victim seemed sad and told Babysitter that her dad hit her face, stomach, and back, and Victim would "motion" the hitting. Babysitter made a "hotline" call that was referred to an employee of the Ray County Children's Division ("Investigator").

Investigator received the hotline notification on August 3, 2017. She called Babysitter and went over the hotline report with her. Investigator and two law enforcement officers went to the home where Victim and her family were living, which belonged to Victim's grandparents. At that time, the grandmother was with the children, and both of the children's parents were at work. Investigator could immediately see bruising on Victim's face as she watched television, even though the room was dimly lit. Investigator examined Victim and saw bruising on Victim's forehead and on the left side of Victim's face, and she saw petechiae under Victim's eyes and in her eyes as she got closer. Investigator, in the light of the police officer's flashlight, could see "[m]ultiple bruising of all stages, all colors" on Victim's back and buttocks. There was also a bruise on Victim's chest.

3

During the investigation, Aldana returned to the home. Investigator introduced herself and told him why she was there. Aldana told Investigator he did not realize that Victim had any bruising on her. He said that Victim played with her siblings and possibly got bruises that way. Aldana stated that the siblings did not hit Victim, but, when asked, Aldana admitted that he had spanked Victim the previous night with an open hand. He stated that Victim had been pooping her pants, and he had spanked her for it three nights in a row. Aldana told Investigator that they had made an appointment for Victim to go to the doctor about her pooping her pants, and that the appointment was a couple of weeks out. Aldana told Investigator that he had seen the red marks in Victim's eyes, and he believed they were from her straining to poop. Aldana agreed to a safety plan wherein he would leave the residence for a while, and Victim's mother ("Mother"), who had since returned home, agreed to take Victim to Children's Mercy Hospital for examination. Mother asked Aldana's sister ("Aunt") to meet them at Children's Mercy, and Aunt agreed. Investigator was worried about Mother's "protective capacities," and so the safety plan that was devised was for Victim and her baby brother to go home with Aunt after the hospital examination. Upon examination of Victim, Children's Mercy diagnosed child abuse. The nurse practitioner ("NP") who examined Victim later in the month of August, did not see any bruises on Victim at that time but reviewed the photos taken of Victim's injuries and did not believe that the petechiae or subconjunctival hemorrhages to Victim's eyes were caused by Victim straining for a bowel movement. NP consulted with Victim's GI doctors, who indicated that it would be "pretty rare" to see injuries like those on Victim's face due to constipation. NP opined that straining might produce "one or two" petechiae but not the

4

amount that Victim had. NP concluded that straining was not a "plausible explanation" for Victim's injuries, but rather they could have been caused by blunt force trauma to both sides of the face or by "compression [or] strangulation" including a hand placed on Victim's face to keep her quiet. NP could not completely rule out straining as a cause of the petechiae, however, or state to a reasonable degree of medical certainty that they were not caused by straining. NP also testified that the bruises on Victim's back and bottom were not consistent with accidental falls because when children fall accidentally, they usually fall forward and bruise bony prominences.

Victim also participated in a forensic examination on August 7, 2017. During this interview, Victim said she received her injuries from Aldana hitting and spanking her. Victim indicated that Aldana punched her in the stomach and hit her face. When the interviewer asked Victim about the marks on her face, Victim answered, "Bruises. Bruises. Daddy gave me bruises."

Aldana was interviewed by a detective on August 8, 2017. After the interview, Aldana told the detective that he was mad at himself for getting himself in that situation. Aldana stated that "his family had a problem and his way of fixing that was him going to anger management." He did not believe that law enforcement or DFS needed to be involved in the situation.

Aunt testified at trial that Victim and her baby brother stayed with Aunt for thirteen months, and although Victim continued to have problems in the bathroom causing her to strain and cry, she did not ever develop new bruising on her face from her straining. While Victim stayed with Aunt, she would sometimes talk about how Aldana would spank her butt and

5

her face.    Aldana also testified at trial, stating that Victim had periodically struggled with constipation, and she was struggling in August of 2017. Due to her constipation, Victim would strain, and her face would get red; sometimes she could go, and sometimes she could not. Sometimes she would leave the bathroom and then have accidents. Aldana testified that he, Mother, and Victim's grandmother decided that Aldana would "step in" and address the issue. On August 2, 2017, Victim strained on the toilet but could not go. Aldana "got tired of watching her struggle," so he had her get up and go into the living room. About fifteen minutes later, Victim curled up and passed her bowel movement. Mother changed Victim, and then Aldana spanked her. "[T]he day before [the police] showed up" was the last time Aldana spanked Victim; Mother and the grandmother told Aldana, "This doesn't look like it's working." Aldana did not think he had been spanking Victim hard enough to leave bruises.

Mother testified in rebuttal. She said that Victim had had issues with constipation "on and off since she was a newborn" due to complications from a hernia. Mother testified that the morning Victim and the baby went to stay with Babysitter, Mother had to leave early, so she left the children with Aldana. Victim did not have any marks on her face when Mother left home. Mother picked the children up from Babysitter's house after work and then noticed the "red spots around [Victim's] eyes." Mother asked Aldana about the marks, and he responded that he did not know. Mother was "absolutely not" okay with Aldana spanking Victim for her bathroom issues, and she and the grandmother had not asked Aldana to "deal with" Victim. Mother never saw Aldana spank Victim, but she knew he had spanked her. One time Aldana had spanked Victim in the bathroom, and another time

6

he pulled her into the bedroom to spank her while Mother was in the shower; after the shower Aldana was holding the door shut so Mother could not enter the room. Mother had never seen petechiae or hemorrhaging on Victim's face from her straining to use the restroom; the only time she saw them was after Victim had been left alone with Aldana.

Aldana's prior ex-wife ("Ex-wife") also testified on rebuttal. Aldana objected, and after an offer of proof was made, the trial court allowed Ex-wife to testify that when the son she had with Aldana had been an infant, he was crying when the parents were both getting ready for work. Ex-Wife asked Aldana to make a bottle for their son. He did, but the baby continued to cry and would not take the bottle. When Ex-Wife asked Aldana to bring the baby to her, the frustrated Aldana threw the baby to Ex-Wife, who was on a bed, from a distance of about five feet.

The jury found Aldana guilty of child abuse for the injuries to Victim's face (Count I); for injuries to her back (Count II); and for injuries to her buttocks (Count III). This appeal follows.

### Count I Verdict Director

Aldana's first two points on appeal involve the verdict director that the trial court submitted to the jury for Count I, and those two points will be discussed together. While Aldana objected at trial to this instruction on the basis that he believed there was insufficient evidence to establish that he caused Victim's facial injuries and that they were not simply the result of her straining due to constipation, he did not raise before the trial court the issues he raises here, and so the alleged errors are not preserved for appellate

7

review. *See* Rule 28.03[2] ("Counsel shall make specific objections to instructions or verdict forms considered erroneous. No party may assign as error the giving or failure to give instructions or verdict forms unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds for the objection . . . . The objections must also be raised in the motion for new trial in accordance with Rule 29.11.").

Aldana urges this Court to review the alleged errors for plain error under Rule 30.20. Plain errors may be considered in this Court's discretion "when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Plain error review involves two steps: (1) we must determine whether the trial court committed evident, obvious, and clear error that affects the defendant's substantial rights; and (2) if we find plain error, we must determine whether manifest injustice or miscarriage of justice has occurred. *State v. Weyant*, 598 S.W.3d 675, 678 (Mo. App. W.D. 2020). "When the unpreserved allegation concerns instructional error, plain error exists when it is clear that the circuit court has so misdirected or failed to instruct the jury that manifest injustice or miscarriage of justice has resulted." *Id.* (internal quotation omitted). "Instructional error seldom rises to the level of plain error." *State v. Hawkins*, 58 S.W.3d 12, 17 (Mo. App. E.D. 2001). "If a defect is not readily apparent to alert counsel preparing to argue the case, there is very little likelihood that the jury will be confused or misled." *State v. Tisius*, 362 S.W.3d 398, 411 (Mo banc 2012) (quoting *State v. Green*, 812 S.W.2d 779, 787 (Mo. App. W.D. 1991)). Aldana

---

[2]All Rule references are to the Missouri Court Rules (2023) unless otherwise noted.

8

argues that the trial court plainly erred in submitting the verdict director for Count I because the verdict director involved multiple acts under a single count, allowing the jury to find him guilty without unanimous agreement, and also because there was not sufficient evidence of one of the two alternatives in the disjunctive instruction. Aldana argues that this instruction suffers from the same defect as that in *State v. Celis-Garcia*, 344 S.W.3d 150 (Mo. banc 2011). In *Celis-Garcia*, the instruction allowed the jury to find the defendant guilty if it found that she committed an act of child sexual abuse; however, the evidence reflected that the defendant committed multiple separate and distinct acts during the relevant time period on different days and in different locations. *Id.* at 154. The Court concluded that some of the jurors could have found that one particular incident of abuse occurred warranting the conviction, while others might have found that a separate and different incident occurred, thereby impermissibly convicting the defendant on less than a unanimous finding by the jury of the same criminal act. *Id.* at 158.

*Celis-Garcia* instructs that, in determining whether a case is a "multiple acts" case, the reviewing court should consider:

> "(1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular where there is an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct." 75 AM. JUR. 2D *Trial* §1511.

*Id.* at 156.

The case before us is not a multiple acts case. The verdict Director for Count I read:

As to Count I, if you find and believe from the evidence beyond a reasonable doubt:

First, that on or about or between July 31, 2017[,] and August 3, 2017, in the State of Missouri, defendant knowingly caused [Victim] to suffer physical injury, and

Second, that the physical injury suffered was the result of abuse, by suffocation and/or blunt force trauma to [Victim's] face, leaving bruising on the face, hemorrhages in the eyes and petechiae around her eyes, and

Third, that [Victim] was then less than eighteen years old, and defendant knew that [Victim] was less than eighteen years old, and

Fourth, that defendant was eighteen years of age or older, then you will find the defendant guilty under Count I of abuse of a child.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

Unlike in *Celis-Garcia*¸ the abusive act alleged was the causing of Victim's facial injuries by Aldana at some point between July 31 and August 3. Instead of multiple distinct acts of abuse in multiple locations, the above verdict director allowed the jury to find, in the disjunctive, two different *means* of causing a single set of injuries, all motivated by the same occurrence, Victim's toilet accidents.

This case is more closely aligned with *State v. Richter*, 504 S.W.3d 205 (Mo. App. W.D. 2016). In *Richter*, an infant was abused in a single act, causing severe injuries. *Id.* at 207-08. The treating physicians believed that the infant suffered these injuries *either* from being shaken or from non-accidental head trauma very recent to his being taken to the hospital, not from an accidental fall as the defendant babysitter had reported. *Id.* The verdict-directing instruction in *Richter* allowed the jury to convict if it found that the babysitter "struck or shook" the infant victim, causing his injuries. *Id.* at 211. This Court found in *Richter* that the jury did not need to be unanimous on whether the defendant had caused the victim's injuries by shaking or striking, because the evidence supported either alternative, and the jury was "unanimous as to the ultimate issue of guilt or innocence, and

10

need not be unanimous as to the means by which the crime was committed." *Id.* (quoting *State v. Fitzpatrick*, 193 S.W.3d 280, 292 (Mo. App. W.D. 2006)); *see also State v. Weyant*, 598 S.W.3d 675, 680 (Mo. App. W.D. 2020) (holding jury instruction requiring jury to convict if it found that defendant committed sodomy for the purpose of either sexual gratification or to terrorize the victim was proper since evidence supported both alternatives). It was a single act of abuse causing a single injury.

Similarly here, the verdict director allows the jury to "find all necessary elements of the crime . . . without determining the specific means by which [Victim] was injured." *Richter*, 504 S.W.3d at 212 n.5. "A disjunctive submission of alternative means by which a single crime is committed is proper if both alternatives are supported by sufficient evidence and the alternative means are in the same conceptual grouping." *Id.* at 211 (internal quotation omitted).

Aldana's second point on appeal is that there was insufficient evidence of one of the two alternatives submitted in the disjunctive verdict director, that Victim's facial injuries were the result of suffocation. The examining NP, after consulting with GI physicians, opined that it would be "pretty rare" to see those types of injuries merely from straining to have a bowel movement. NP also observed that such injuries were not normally seen even in women who had just given birth. The petechiae and hemorrhages in Victim's eyes, NP opined, were more likely caused by blunt force trauma or by suffocation, which she agreed could include a hand placed over Victim's mouth to keep her quiet. Aldana makes much of NP's inability to give an opinion to a reasonable degree of medical certainty that these injuries could not have been caused due to straining alone. But the physical injuries

11

themselves and the fact that Victim strained during bowel movements were not the only evidence available to NP or to the jury. Aldana admitted to "spanking" Victim, and apparently Aldana hit Victim hard enough to cause bruising on her back and buttocks. Also, in her forensic interview, when asked about the marks on her face, Victim indicated that Aldana had hit her face, giving her bruises. Victim also told Aunt that Aldana had hit or spanked her face, and Mother and Aunt both testified that, although Victim continued to strain in the bathroom, she had not subsequently experienced facial injuries similar to those that were the subject of Count I. Finally, Mother testified that Aldana did not hit Victim in front of her and kept her out of the bedroom when he was punishing Victim, so she could not testify as to whether Aldana struck Victim in the face or suffocated Victim by placing his hand over her mouth and nose during that incident. This is circumstantial evidence that the injuries could have been caused by suffocation, such as by Aldana putting a hand over Victim's mouth to keep her quiet. "There is no distinction between direct and circumstantial evidence, and therefore, a court should not overrule a fact-finder 'simply because the cause depended . . . upon circumstantial proof.'" *State v. Curtis*, 497 S.W.3d 381, 383 (Mo. App. E.D. 2016) (internal citation omitted). "This is not an assessment of whether the Court believes that the evidence at trial established guilt beyond a reasonable doubt but rather a question of whether, in light of the evidence most favorable to the State, any rational fact-finder could have found the essential elements of the crime beyond a

reasonable doubt." *Richter*, 504 S.W.3d at 208 (quoting *State v. Nash*, 339 S.W.3d 500, 509 (Mo. banc 2011)).[3]

We conclude that this is not a multiple-acts case, that the verdict-directing instruction for Count I did not impermissibly allow the jury to convict based on non-unanimous findings that different acts of abuse occurred as in *Celis-Garcia.* Rather, the verdict director for Count I allowed the jury to unanimously find all of the elements of the crime without requiring the jury to unanimously agree as to the specific means Aldana inflicted Victim's injuries, and that both of the alternatives in the disjunctive verdict director were supported by sufficient evidence. Accordingly, Aldana has failed to establish that plain error occurred. Aldana's first two points on appeal are denied.

### *Verdict Directors for Counts II and III*

Aldana's third and fourth points on appeal involve two different verdict directors, but with the same issues, so we will also discuss those together. Specifically, Instruction 7, the verdict director for Count II, and Instruction 8, the verdict director for Count III, failed to include a cross-reference to the instruction based on MAI-CR 4th 406.20, the disciplinary justification for use of force on a child. Aldana admits that he did not object to these instructions on this basis at trial or raise them in a motion for new trial and, therefore, did not preserve the alleged errors for appellate review pursuant to Rule 28.03.

---

[3] If the State had chosen to submit a verdict director solely setting forth the Victim's injuries were caused by striking, Aldana would most certainly be before us arguing that the evidence supported two alternatives as to how the injuries were caused (i.e. striking and suffocation) and the State failed to establish that the Victim was not suffocated so any conviction should be overturned.

13

Aldana requests this Court to review the instructions for plain error pursuant to Rule 30.20. As stated above, instructional error rarely constitutes plain error, and to constitute plain error, "the defendant must show that the trial court 'so misdirected or failed to instruct the jury' that the error affected the jury's verdict." *State v. Dorsey*, 318 S.W.3d 648, 652 (Mo. banc 2010) (quoting *State v. Salter*, 250 S.W.3d 705, 713 (Mo. banc 2008)).

As to Counts II and III, Aldana presented evidence that he was Victim's father and was therefore "a person with care, custody, or control of the child," and that his intent was to "discipline" Victim by "spanking" her "in a reasonable manner." The Notes on Use for MAI-CR 4th 406.20 provide that if the defendant injects the issue of custodial discipline administered in a reasonable manner, and there is evidence supporting the defense, a justification instruction must be given. Also, "A paragraph making a cross-reference to the instruction will be added to the verdict director as follows: (Second) (Third) ([next numbered paragraph]), that defendant did not act as a person entrusted with the care and supervision of (a minor) (an incompetent) as submitted in Instruction No. ____,". MAI-CR 4th 406.20 Notes on Use, ¶2. Although an instruction based upon MAI-CR 4th 406.20 was submitted to the jury, the cross-references prescribed by paragraph 2 were omitted from the verdict directors for Counts II and III.

However, the omission of a mandatory cross-reference in a verdict director is not plain error if the jury is not misled. In *Hawkins*, , a similar mandatory cross-reference was not given, and it was determined not to constitute plain error. 58 S.W.3d at 19.

> While lack of a cross-reference in the verdict directors does not comply with the pattern [defense] instruction's Notes on Use, the attorneys in this case clearly referred the jury to and discussed [the defense] during their closing

14

arguments, including making specific references to the [defense] instruction. After reviewing the instructions as a whole and the closing arguments, we conclude . . . that there was no manifest injustice or miscarriage of justice in the omission from the verdict directors of a cross-reference to the separate defense instruction.

*Id.* In this case, the trial court read Instruction No. 9 (pertaining to Count II) aloud to the jury. The transcript shows the trial court fully set forth the discipline justification defense in the instructions:

> Instruction No. 9. One of the issues as to Count II in this case is whether the use of force by the Defendant against [Victim] was to promote the welfare of a minor. In this state, use of force by a person who is entrusted with the care and supervision of a minor child is lawful in certain situations. A parent entrusted with the care of and supervision of a minor may use force when he reasonably believes that the force used is necessary to promote the welfare of such minor provided the force used is not designed to cause or believed to create the substantial risk of causing disfigurement or extreme pain or extreme emotional distress.
> As used in this instruction, the term reasonable belief means a belief based upon reasonable grounds. That is, grounds which would lead a reasonable person in the same situation to the same belief. This depends upon how the facts reasonably appear. It does not depend upon whether the belief turned out to be true or false.
> Bear with me for just a minute.
> Continuing with Instruction No. 9. On the issue of the use of force to promote the welfare of a minor, as to Count II in this case, you're instructed as follows: If the Defendant was a parent entrusted with the care and supervision of [Victim], a minor, and reasonably believed that the use of force against [Victim] was necessary to promote the welfare of such minor, and that the Defendant did not use force which was designed to cause death or nor which Defendant believed would create a substantial risk of causing disfigurement or extreme pain or extreme emotional defense—distress, excuse me, then the Defendant's use of force was lawful.
> The State has the burden of proving beyond a reasonable doubt that the Defendant did not act in the lawful promotion of the welfare of [Victim]. Unless you find beyond a reasonable doubt that the Defendant did not act in the lawful promotion of the welfare of [Victim], you must find the Defendant not guilty under Count II.
> As used in this instruction, the term reasonable belief means a belief based upon reasonable grounds. That is, grounds which would lead a

15

reasonable person in the same situation to the same belief.  This depends upon how the facts reasonably appear.  It does not depend upon whether the belief turned out to be true or false.

Instruction 10 was basically an identical instruction that pertained to Count III.  Thus, both Instructions 9 and 10 made explicit reference to the specific charges to which the defense instructions pertained, and both instructions advised the jury that it must acquit Aldana of the relevant charge if the State had failed to meet its burden to disprove the defense. Moreover, both the State and Aldana talked about the State's burden to prove that the force used was not justified by reasonable discipline of Victim.  This Court concludes that, despite the lack of the cross-reference in the verdict directors for Counts II and III, there is no likelihood that the jury was not fully aware of the defense or that it did not consider it in its deliberations and the failure to include the cross-reference does not equate to plain error in this case.

Aldana's Points III and IV are denied.

### *Text of Instructions 9 and 10*

Aldana's fifth point on appeal is that the trial court erred in failing to ensure that the complete text of Instruction 9 (set forth above) and Instruction 10, which is identical to Instruction 9 except it relates to Count III instead of Count II, was submitted to the jury. As quoted above, the full text of the instructions was read aloud to the jury by the trial court.  In addition, both parties offered instructions based on MAI-CR 4th 406.20 to the trial court.  The only difference was that the State's version of the instructions, which the trial court used, included the word "disfigurement" and Aldana's version did not.  ("I'm going to offer instructions that don't have the word 'disfigurement' but otherwise exactly

16

the same."). A copy of all of the instructions was provided to each juror when they began their deliberations.

After the jury's deliberations, they were asked to return all verdict forms to the trial court. When the verdict forms were returned to the trial judge by the jury foreperson before the verdicts were read, the judge noted that there were some "loose instructions here on top" and asked the foreperson if "[t]hose are from [the] copies you were given[?]" The foreperson responded affirmatively. It appeared as though the foreperson and/or some of the jurors removed the staples and disassembled their sets of jury instructions during deliberations.

Later, during the penalty phase of deliberations, the jury asked the court for the instructions from the guilt phase of the trial. On the record, without the presence of the jury, the trial court stated, "I can probably dig out one we haven't -- they didn't tear apart." He then stated he could "give them the original. I just thought maybe we had one that hadn't been—the staples hadn't been pulled loose." Aldana objected, stating it was "just to be objectionable," with no further detail as to the basis of the objection, and the State surmised that the jury "might want to know which charge is which to see which one they want to give a certain sentence to." At this point, everyone had an opportunity to make sure the set of instructions sent back to the jury was a correct one—the State said "Is that the one I gave you? I think so. Better double-check though." It is unclear whether everyone took the opportunity to check the instructions before they were sent back to the jury room.

When Aldana's counsel was preparing the record on appeal, the jury instructions in the court's record (Court Exhibit 8), which were filed into the record, contained incomplete

17

copies of Instructions 9 and 10. Each instruction should have been two pages but only the first page of each instruction is included in Court's Exhibit 8. The portion of Instructions 9 and 10 that appeared on page 2 of each instruction as was read to the jury but does not appear within Court's Exhibit 8 read:

> distress, excuse me, then the Defendant's use of force was lawful.
> The State has the burden of proving beyond a reasonable doubt that the Defendant did not act in the lawful promotion of the welfare of [Victim]. Unless you find beyond a reasonable doubt that the Defendant did not act in the lawful promotion of the welfare of [Victim], you must find the Defendant not guilty under Count II.
> As used in this instruction, the term reasonable belief means a belief based upon reasonable grounds. That is, grounds which would lead a reasonable person in the same situation to the same belief. This depends upon how the facts reasonably appear. It does not depend upon whether the belief turned out to be true or false.

The record is clear the trial court read the full text of the instructions to the jury before they were excused to deliberate. The court then, on the record, stated that it was marking the original jury instructions that it had just read to the jury as Court's Exhibit 8 and that Court's Exhibit 8 was being sent back to the jury room with the jury. This is highly indicative that the original instructions sent back to the jury room with the jury during the guilt phase of the trial included the complete set of instructions exactly as the court had read them to the jury. All parties had an opportunity to examine the instructions when they were prepared and again when they were sent to the jury during the penalty phase, and Aldana made no objection to the form of the instructions, only a general objection that they were being provided to the jury at all during the penalty phase. Further, the portions of the two verdict directors that do not appear in the Legal File would have no bearing on sentencing. If the jury received the complete set of instructions as was read into the record

18

by the trial court, there was no error in the trial, plain or otherwise, just in the filing of Court's Exhibit 8 into the record.

Even reviewing for plain error, and even if the incomplete instructions had been sent to the jury room, Aldana failed to meet his burden to establish that there is manifest injustice or a miscarriage of justice. Even the incomplete set of instructions discusses that the use of force may be reasonable if implemented by a person who is entrusted with the care and control of a minor child, and it defines a "reasonable belief" that such force is necessary. The second half of the pattern instructions for the discipline justification defense is largely repetitive of the first half. *See* Instruction No. 9, above. The trial court read into the record the entire text of the instruction, *twice* including Instructions 9 and 10, and both parties discussed this defense thoroughly in their closing arguments. We conclude that Aldana failed to meet his burden to establish that the jury did not receive a complete set of instructions, and further, even if an incomplete set was sent to the jury room during the penalty phase, there is no reasonable likelihood that the jury was confused or misled such that it did not consider this defense in its deliberations. Therefore, no manifest injustice or miscarriage of justice occurred.

Point V is denied.

### Rebuttal Witness Testimony

Aldana's sixth point on appeal is that the trial court erred in allowing rebuttal testimony from Ex-Wife. Aldana objected to Ex-Wife's testimony at trial, and in his motion for new trial, so the alleged error is preserved for appellate review. Trial courts are allowed broad discretion in admitting or excluding evidence at trial. *State v. Blurton*, 484

S.W.3d 758, 769 (Mo. banc 2016). We review the trial court for abuse of this broad discretion. *Id.* The trial court abuses its discretion when its evidentiary ruling is "clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." *Id.*

Ex-Wife testified that several years prior, Aldana became frustrated when their then six-to-seven-month-old son would not stop crying and would not take a bottle, and Aldana threw the baby to her on the bed from a distance of about five feet. The trial court allowed this limited testimony, after an offer of proof was made, as a prior bad act.

> Evidence of uncharged crimes, wrongs, or acts is inadmissible for the purpose of showing a defendant's propensity to commit the charged crimes. *State v. Barton*, 998 S.W.2d 19, 28 (Mo. banc 1999). Such evidence is admissible, however, if it is both logically and legally relevant. *Id.* To be logically relevant, the evidence of prior misconduct must have a legitimate tendency to establish directly the defendant's guilt of the charged crime. *Id.* If the evidence tends to establish motive, intent, absence of mistake or accident, a common scheme or plan embracing the commission of two or more crimes so related to each other that the proof of one tends to establish the other, or identity, it is admissible. *State v. Bernard*, 849 S.W.2d 10, 13 (Mo. banc 1993). To be legally relevant, the probative value of the evidence must outweigh the prejudicial effect. *Barton*, 998 S.W.2d at 28; *Bernard*, 849 S.W.2d at 13 . . . . The trial court has the discretion to balance the value and effect of evidence. *Id.*

*State v. Wright*, 30 S.W.3d 906, 912-13 (Mo. App. E.D. 2000). Aldana had testified that his use of force on Victim was merely reasonable discipline that he used after discussing the matter with his wife (Mother) and her mother. This testimony was offered as rebuttal to show that Aldana was not engaging in reasonable discipline but was acting in an abusive manner out of frustration with the child, as he had done in the past with his infant son. The trial court did not allow Ex-Wife to testify that Aldana had also been abusive to her or that

20

she was afraid of him.  We do not find that the trial court abused its discretion in allowing this very limited rebuttal testimony or that its admission prejudiced Aldana. Aldana's Point VI is denied.

## Conclusion

For all of the above-stated reasons, we affirm the judgment of the trial court.

_____
Gary D. Witt, Judge

All concur